## IN RE MACKNIGHT.

[Argued August 3, 1891. Decided August 10, 1891.]

CERTIORARI—*Constitutional interpretation.*—Section 3, article viii. of the Constitution, providing that the Supreme Court "shall have power in its discretion to issue and to hear and determine writs of . . . . *certiorari,* . . . . and such other original and remedial writs as may be necessary or proper to complete exercise of its appellate jurisdiction," cannot be construed to restrict this court to the use of a writ of *certiorari* in the exercise of its appellate jurisdiction only, as the clause "necessary and proper to complete exercise of its appellate jurisdiction" relates to "such other original and remedial writs," and not to writs specifically named.

CONTEMPT OF COURT.—A witness who refuses to answer a question which is neither relevant nor pertinent to the matter in issue before the court is not punishable for contempt in persisting in such refusal.

SAME.—Petitioner published an article purporting to give the statements of a third person in reference existing against the contestants of a will, in substance as follows: "An old Montanian, who is familiar with the *Davis Will Case* . . . . said: 'Prejudice? Why, of course, there's prejudice. The money involved in this case has turned the head of every man . . . . in Silver Bow County. Republicans and Democrats . . . . stood together for the re-election of Judge McHatton solely because they knew that he could never be won over to any other view of the will than the Butte view. . . . . there is money enough in this business to corrupt every corruptible man in the State, and it has caused a deadly bias in the minds of some men who could not be bought with money at all. . . . . Nothing like a fair trial can be had in Silver Bow County, as neither a judge nor a jury could be obtained there that would render a decision in accordance with the evidence. . . . . Unless a change of venue is granted, the jig is up for the contestants of the will.'" *Held*, not a contempt of the court, where the contest of the will was pending. (*Territory* v. *Murray*, 7 Mont. 251, distinguished.)

Original proceeding. Application for a writ of habeas corpus by James A. MacKnight, imprisoned for contempt by the District Court of the Second Judicial District, Silver Bow County, McHATTON, J.

*Elbert D. Weed*, for Petitioner.

The judge of the District Court of Silver Bow County caused an attachment to issue out of that court, requiring petitioner to show cause why he should not be punished for contempt for publishing the article in question. (See opinion of the court.) In obedience to this attachment the defendant appeared in that court. Counsel was appointed by the court to represent the State in the proceeding against petitioner, and among other witnesses called by the State was the petitioner here, who was there the defendant in the contempt proceeding. While being examined by the State as a witness on behalf of the State, he was asked to disclose the name of the person who made the remarks embodied in the publication. Petitioner declined to answer the question, upon the ground that it was not pertinent to the issue; that it was immaterial and irrelevant; and that he could not be compelled to be a witness against himself in a criminal proceeding. A proceeding in contempt is in the nature of a criminal trial. Contempt is disorderly, contemptuous, insolent language or behavior in the presence of the court, tend-

ing to disturb its proceedings, or impair the respect due to its authority, a disobedience to the rules or orders of the tribunal *which interferes with the administration of justice.* (3 Am. & Eng. Encycl. of Law, 777; Anderson's Law Dict.; Bouvier Law Dict.; Comp. Stats. Mont. p. 210, § 584, first div.) There is one supreme test of publications charged to be contemptuous. Do they tend to interrupt the orderly proceedings of the court, and the administration of justice? If not, they cannot be considered as contempts of court. (*Dunham* v. *State,* 6 Iowa, 245; *Ex parte Steinman,* 95 Pa. St. 220; 40 Am. Rep. 637.) The petitioner offered to the court his explanation and apology for the article, stating under oath that said article was published in good faith, and with no intention of reflecting upon the honor or integrity of the court. In such case, if the defendant declares that nothing improper was intended, and that he acted in good faith, and the language itself is reasonably susceptible of the construction which is claimed for it, then his excuse and explanation is sufficient, and he should be purged of the contempt charged. The authorities hold that the question is largely one of *quo animo.* (*People* v. *Few,* 2 Johns. 290; *Piatt* v. *St. Clair,* Wright, 532; *State* v. *Trumbull,* 4 N. J. L. 139; *Ex parte Woodruff,* 4 Pike, 630; *Clark* v. *Blakesly,* 1 Scott N. R. 393; *Spink* v. *Francis,* 19 Fed. Rep. 678; *Ex parte Beebees,* 2 Wall. Jr. 127; *In re Woolley,* 11 Bush, 109, 110.) The petitioner in refusing to answer the question merely availed himself of the constitutional privilege of refusing to be a witness against himself. This constitutional privilege was not waived, nor could it be waived by answering certain other questions propounded at the same time. (Rapalje on Contempt, p. 104; *Higdon* v. *Heard,* 14 Ga. 255.) Petitioner was testifying on his own behalf, but had been called as a witness for the State. If any contempt had been committed it was in the publication of the article, and the court had no authority to inquire as to the name of petitioner's informant. (*Ex parte Zeehandelaar,* 71 Cal. 238; *Ex parte Rowe,* 7 Cal. 179; *Ex parte Fisk,* 113 U. S. 718; *Ex parte Perkins,* 29 Fed. Rep. 908; *Holman* v. *Mayor etc.* 34 Tex. 668; *People* v. *Cassels,* 5 Hill, 164; *People* v. *Hackley,* 24 N. Y. 78; Townsend on Slander and Libel, 407; *Ex parte Cohen,* 6 Cal. 318; Wharton's Criminal Pleading and Practice,

§ 959; *Ex parte Beck*, 3 Blatchf. 113; *Mattor of Morton*, 10 Mich. 208; *Matter of Hall*, 10 Mich. 210; 1 Thompson on Trials, § 150; *In re Woolley*, 11 Bush, 109.) The power of the court to punish for an alleged contempt of its authority, though undoubted, is in its nature arbitrary, and its exercise is not to be upheld, except under the circumstances and in the manner provided by law. (*Batchelder* v. *Moore*, 42 Cal. 413, 414; *People* v. *O'Neil*, 47 Cal. 109; *People* v. *Jacobs*, 66 N. Y. 9; *Case of Hummell*, 9 Watts, 430; Hawes on Jurisdiction, § 223.) It is a power which has its justification in necessity alone, and should rarely be exercised, and never but in those cases where the necessity is plain and evident. (Starkie on Slander and Libel, p. 802, and cases cited.)

*Thompson Campbell, amicus curiæ.*

HARWOOD, J. — By return made to the writ of habeas corpus, and the writ of *certiorari* issued in aid thereof, it appears that the prisoner was adjudged, by the District Court of the Second Judicial District, guilty of having committed a contempt of that court, and was therefore committed to jail. The facts and proceedings whereby the judgment and order of commitment was made appear by the returns as follows: A certain newspaper, known as the Helena Daily Journal, printed and published at the city of Helena, and of general circulation, contained in its issue of July 7, 1891, among other items, the following: —

### WHY THERE'S PREJUDICE.

"An old Montanian, who is very familiar with all the ins and outs of the *Davis Will Case*, was discussing yesterday the subject of the change of venue, asked in this celebrated case, when he said: 'Prejudice? Why, of course, there's prejudice. The money involved in this case has turned the head of every man, woman, and child in Silver Bow County. Republicans and Democrats are sworn allies and friends in all that pertains to keeping the estate in the hands of the Butte parties, and they stood together for the re-election of Judge McHatton solely because they knew that he could never be won over to any other view of the will than the Butte view. This was why no Republican nomination was made, and why McHatton was so

readily adopted as the candidate and elected by so pleasing a vote. I tell you there is money enough in this business to corrupt every corruptible man in the State, and it has caused a deadly bias in the minds of some men who could not be bought with money at all. There are not more than one or two cases to-day before the courts of this country in which the stake involved is so great. Nothing like a fair trial can ever be had in Silver Bow County, as neither a judge nor a jury could be obtained there that would render a decision in accordance with the evidence. Therefore, unless a change of venue is granted, the jig is up for the contestants of the will.' This gentleman is a Republican who travels a good deal about the State, but a Democrat beside him, who has been a good deal in Silver Bow County, said he had to admit the truth of the stricture."

On the ninth day of July, 1891, Hon. JOHN J. McHATTON, judge of department 1 of said court, made and filed in his court an affidavit setting forth that an action or proceeding for the probate of an alleged will of Andrew J. Davis, deceased, was pending in said court; that such case or proceeding was generally known as the *Davis Will Case;* that said MacKnight and other persons named in the affidavit were the editors and publishers of said newspaper, and published the matter recited; and that "said publication has come under the observation of the judge of said court, and the charges therein made are false and contemptuous."

Upon the filing of the affidavit, said court issued an attachment for the persons charged with commission of contempt by said publication. In the proceedings which were afterwards had before said court, in the matter of this alleged contempt, the petitioner, MacKnight, appeared to show cause why he should not be punished for contempt as charged; and answered, admitting that he was the managing editor of said newspaper at the time of said publication; admitted that he alone wrote and caused to be published in said newspaper the matter recited; but denied that the same was a contemptuous act towards said court, or the judge thereof, or was so intended by the author and publisher thereof.

Then followed an inquiry before said court, wherein said MacKnight, under oath, explained to the court where and

under what circumstances he heard the comments, which were recited in the publication. He stated, in effect, that at the time he wrote and published said comments a proceeding for an order for a change of the place of trial of the contest of said alleged will, in said *Davis Will Case*, was being heard upon appeal by the Supreme Court of this State; that he had heard much comment by various persons, at different hotels, upon the streets, and about the court-house in the city of Helena, in relation to said application for a change of venue, which expressions, uttered by several persons, were put together, and made up the matter published; that said matter was published in a column which purported by its heading to contain street gossip and incidents of interest.

At this point the inquiry was directed to the ascertainment of the names of the persons who had made the comments mentioned.

In answer to questions calling for the names of such persons, the witness said: . "There were individuals that made some of the comments in the article whose names I cannot possibly recall, but it was in private conversation." In only one case could the witness recall the person who stated what constituted a portion of the comment published, namely, that which related to the political situation in Silver Bow County at the time of the last election. The witness said: "As a matter of fact, the gentleman who made those remarks did not wish them printed. He had no feeling or interest in the *Davis Will Case*. I gave him my word that I would not in any way disclose his name, and wrote the paragraph several days after the conversation." The name of the person in question was demanded by the court under peril of commitment for contempt if the witness refused to disclose it; but the witness declined to state the name of such individual without his permission. A continuance was then had to give the witness an opportunity to consult said person, and find whether it would be agreeable to have his name mentioned to the court in this proceeding. On resuming the hearing, the witness stated that the individual in question, whose comments had been thus taken by the witness and published, would not consent to have his name given to the court, and the witness declined to disclose it; whereupon the court adjudged

the witness guilty of contempt for refusing to disclose the name of the person demanded, and refused to pass upon the original charge of contempt in said proceeding, and refused to hear counsel for prisoner upon the question as to whether in law any contempt had been committed, and ordered the prisoner committed to jail. It is this imprisonment which the prisoner insists is illegal.

Upon the hearing before this court, counsel who appeared in the court below, as *amicus curiæ* in the proceedings, also appeared here, and raised the point that this court has no jurisdiction to bring up for review by writ of *certiorari* the proceedings of the lower court in the matter in question. In support of this position, he cites that clause of section 3, article viii. of the Constitution, which provides that the Supreme Court "shall have power, in its discretion, to issue and to hear and determine writs of habeas corpus, mandamus, *quo warranto, certiorari*, prohibition, and injunction, and such other original and remedial writs as may be necessary or proper to complete exercise of its appellate jurisdiction." Counsel contends that the writ of *certiorari*, and others named in said clause, can only be issued by this court when the same are necessary or proper in the exercise of its appellate jurisdiction, and therefore the issuance of the writ of *certiorari* in this case was irregular, because it was not in aid of the appellate jurisdiction of this court. His position is that the latter words of said clause relate to the writs specifically mentioned, and restrict this court to the use of said writs, in the exercise of its appellate jurisdiction only.

The case at bar presents a striking illustration of the error involved in such a construction of said clause of the Constitution as is contended for by counsel. It is clear that this court is given power to issue, hear, and determine all of the writs mentioned, among others the writ of habeas corpus. That is conceded by all, but the contention is that this court can issue, hear, and determine said writs only in the exercise of its appellate jurisdiction. Now, how would the writ of habeas corpus be ordinarily used by the Supreme Court *in the exercise of its appellate jurisdiction?* So the writ of *certiorari* is among the writs which this court is expressly authorized to issue, hear, and determine. Yet that writ is peculiarly inapplicable to use

in aid of appellate jurisdiction; and, indeed, cannot be lawfully issued in cases where error may be reached by appeal. (Code Civ. Proc. § 555.) Is it to be presumed that the framers of the Constitution placed within the jurisdiction of this court these writs, the use and effect of which, in the actual administration of law, is so well defined, and some of which are in no way adapted to, or used in, the exercise of *appellate jurisdiction,* and then restricted the use of said writs by this court simply to the aid of its appellate jurisdiction? We think not. The clause carries no such purport with it. The writs named are defined in law; and their use in the administration of justice is fixed by long usage and well-settled principles.

It is provided in the Constitution that this court shall have power "to issue and to hear and determine" said writs, which are known and certain implements of courts. Their office being known, the framers of the Constitution understood exactly what jurisdiction was being granted by placing them within the power of the court to issue, hear, and determine. In that there was no uncertain grant of jurisdiction. But the Constitution does not stop there. It adds: "And such other original and remedial writs as may be necessary or proper to complete exercise of its appellate jurisdiction." These other original or remedial writs are restricted to the exercise of appellate jurisdiction. Why? Because otherwise this grant of jurisdiction to frame, issue, hear, and determine new writs, heretofore unknown in the administration of justice, would have been the granting of an unknown, unlimited, and undefined power; therefore such other writs were limited to the exercise of appellate jurisdiction.

To further indicate the use which it was intended would be made of the writ of *certiorari,* the same section of the Constitution provides that "each of the justices of the Supreme Court may issue and hear and determine writs of *certiorari* in proceedings for contempt in the District Court."

The jurisdictional question raised by counsel is not sustained.

Returning to the consideration of the merits of the proceedings under review, we find counsel for the prisoner challenging the legality of the imprisonment by two propositions.

*First.* That if a contempt was committed by such publication, as charged, then the contempt was committed by that act;

and relevant inquiry ceased when it was ascertained who was the author and publisher; that the prisoner admitted the writing and publishing of the comments as charged, and any inquiry beyond that was irrelevant and illegal; that refusal to answer such irrelevant question was a legal right of witness, and commitment for such refusal was unlawful.

*Secondly.* That in the main proceedings the matter charged, to wit, the writing and publishing of the matter set forth, did not in law amount to a contempt of court, and therefore the court was proceeding without jurisdiction, and all questions pertaining to the matter in such proceeding were irrelevant and unauthorized, and the witness had a legal right to respectfully decline to answer any or all questions in a case where the court was without jurisdiction.

We are of the opinion that in this case the law fully sustains both propositions in favor of the prisoner. As to the first proposition, the record shows that the prisoner appeared before the court, and admitted every fact charged as constituting the contempt.

What fact there was in the charge not admitted, or what relevancy there was in the questions which the prisoner refused to answer, the counsel who acted as *amicus curiæ* was unable to explain, and we have been unable to ascertain. It is provided in sections 659 and 660 of the Code of Civil Procedure, that witnesses shall answer questions *legal and pertinent to the matter in issue.* They are not bound to answer questions irrelevant to the issue. (*Ex parte Zeehandelaar*, 71 Cal. 238.)

After the prisoner had admitted the facts set forth in the charge as constituting a contempt, if, then, an inquiry as to facts outside of that charge was necessary to establish contempt, it follows that no contempt was charged in the proceeding.

But suppose the prisoner had answered the question put to him, and said that A made the remarks about the "political situation in Silver Bow County." Would the offense charged, to wit, the publication of said remarks, have been any more certain, or would the gravity of the offense been any greater or less, than it would have been if B had made those remarks? Suppose, again, the prisoner had answered that A made the remarks, and A had been called and questioned, and said that

he got the idea from B; and B had been sent for, and testified that he got the matter from C, and so on *ad infinitum;* how much would this have added to or subtracted from the offense charged against MacKnight, and the punishment due therefor? It is not unlikely comments were made in reference to the application for change of venue, mentioned in the article. Parties on one side of the motion were insisting that the people of Silver Bow County, for various reasons, had become biased or prepossessed with one view of the contest. It was also suggested, and attempted to be shown, that the judge of the lower court was biased and prejudiced. The motion was brought before the Supreme Court on appeal, and these propositions as to bias and prejudice were uttered, published, commented upon, and considered. Now, are the parties who entertained and expressed the views that bias and prejudice existed in peril of the jail of Silver Bow County?

The main charge preferred against the prisoner is not within the acts defined by statute as contempts, nor is it within the general definitions of that offense, as found in the authorities upon this subject. The principal ingredient of the definition of "contempt" *is disregard of the authority of the court.* It is provided in our statute that certain acts or omissions described "are contempt of the authority of the court: *First.* Disorderly, contemptuous, or insolent behavior towards the judge while holding court, tending to interrupt the due course of a trial or other judicial proceeding. *Second.* A breach of peace, boisterous conduct, or violent disturbance, tending to interrupt the due course of the trial or other judicial proceeding." (Code Civ. Proc. § 584.)

Definitions taken from works of authority are as follows:—

"A wilful disregard or disobedience of a public authority." (Bouvier's Law Dict.)

"Disrespect; wilful disregard of the authority of a court or legislature." (Anderson's Law Dict.)

"Contempt is disorderly or insolent language or behavior in the presence of a legislature or judicial body, tending to disturb its proceedings, or impair the respect due to its authority; or a disobedience to the rules or orders of such a body, which interferes with the due administration of law." (3 Am. & Eng. Encycl. of Law, 777.)

Mr. Bishop, in his work on Criminal Law, introduces this subject with the following declaration: "No court of justice could accomplish the objects of its existence unless it could in some way preserve order and enforce its mandates and decrees. The common method of doing these things is by process of contempt." (2 Bishop on Criminal Law, § 243.)

Counsel cites, in support of the proceedings, the law as laid down by Blackstone. This eminent commentator on the laws of England gave his works to the world many years before the adoption of the Constitution of the United States, and at a time when a censorship of the press was thought to be a proper office of government. It is well known that in his time the English courts assumed a much wider scope on the subject of applying the process of contempt to restrict the freedom of speech and publication than in more recent times. And yet this proceeding cannot be supported by citations from Blackstone, without culling from his text the most general observations. The case of *Territory* v. *Murray*, 7 Mont. 251, is cited in support of this proceeding. That case, we think, has no application to the case at bar. The offender in that case was a suitor before the court. It appears that he concocted a scheme, and invented a fictitious set of facts, in relation to the very case under adjudication, in which he was a party. He caused to be telegraphed a statement of the fictitious and alleged events, which he had conjured into apparent existence, and caused the same to be published so as to get it communicated to the attention of the court; and it was clear that he did all this to cause an impression upon the mind of the court which he thought would work to his benefit in the litigation wherein he was interested. That case, it seems to us, ought not to have misled either court or counsel in the case at bar. The publication in the *Murray Case*, *supra*, was put out of consideration, the court observing that the offender had used the press to communicate to the court the fictitious matter which he had concocted, and which he hoped would have an influence. The court passed by the publisher, and turned its attention to the offending suitor. A review of authorities shows clearly that a suitor is held to a stricter accountability for his conduct than parties in no way connected with the litigation.

It is not to be understood that this court approves the propriety of publishing comments of the nature contained in the article in question. We are passing upon a question of law, as between the rights of a citizen and the power of a court to summarily imprison upon a charge of contempt. It is from this point of view that we are considering the publication, and the proposition to punish therefor. The article in question contains expressions concerning a state of influence and feeling. As before observed, the object of the power to punish by process of contempt is to enforce obedience and respect *to the authority of the court.* For this purpose the power is given, and to this purpose the power is limited. It is not to enforce sentimental respect. That must be gained by other means, and will flow ungrudgingly from a generous and law-abiding people to that court where law and justice is administered with able, fearless, and impartial fidelity. The power to punish for contempt being given to preserve proper order within the precincts of the court; to silence and remove those disturbing elements which interfere with or interrupt the due and orderly progress of judicial business; to disarm and punish disobedience or resistance of the lawful authority of the court,—we scan the acts charged and admitted in the case at bar, to see wherein they run counter to this authority of the court. It is clear that the publication of the views expressed as to bias in no way interrupts the orderly progress of the said court in its adjudications; at least, no such effect had been suggested, and it does not appear in the nature of the comments. The authority of the court is bowed to with unhesitating submission, even by the party bold enough to publish the comments in question. Sometimes courts have interposed to prevent publication of matter in reference to the merits of cases pending, and which seems to have a prejudicial influence thereon. But in the case at bar nothing was said in relation to the merits of the case, or the litigants, tending to prejudice. We do not understand that the suggestion that the judge of a certain court, or the people of a certain place, are biased in their view of a certain case in litigation, would make them biased or more biased. Conceding that would be near conceding the charge of bias already. If the assertion that there is a bias subjects to punishment for contempt, then

how would those who make application for a change of venue on that ground, and those who asserted bias and the facts which support the assertion, escape? Such is not the law, because that character of assertion does not interfere with the authority of the court. It follows, then, that this character of assertion stands in that broad field covered by constitutional sanction of the freedom of speech and press. What was the purpose of this constitutional guaranty? Was it to grant freedom to ordinary speech and publication which could excite the resentment of no one? If that was the purpose, then it would be as needful to put into the Constitution a provision that people may freely walk the streets quietly and peaceably. The history of the struggle for supremacy of certain principles and ideas shows the purpose of the law, when such principles or ideas are clothed with that force and dignity, and inscribed upon our Constitution or statute. And so the history of the struggle for the establishment of the principle of freedom of speech and press shows that it was not ordinary talk and publication, which was to be disenthralled from censorship, suppression, and punishment. It was in a large degree a species of talk and publication which had been found distasteful to governmental powers and agencies.

The people of this State did not omit that guaranty of freedom of speech and publication from their constitution, with the ordinary responsibility attached to the misuse thereof. (Art. iii. § 10.)

It is ordered that the prisoner be discharged.

BLAKE, C. J., and DE WITT, J., concur.