STATE ex rel. ANACONDA COPPER MINING CO. et al., Relators, *v.* DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT et al., Respondents.

(No. 1,682.)

(Submitted June 3, 1901. Decided August 1, 1901.)

*Mines and Mining—Mining Claim—Location—Surface Rights —Common Law Rights—Supreme Court—Jurisdiction—Supervisory Control—Writ of Supervisory Control—Mandamus—Certiorari.*

1.   Relators were the owners of patented claims Anaconda, St. Lawrence, Smoke Stack and Rob Roy, and subsequently defendant located the Copper Trust mine on a discovery near the eastern corners of the Smoke Stack

and St. Lawrence, alleging that the vein there discovered passed on its strike through the Smoke Stack, the St. Lawrence and into the Anaconda. Defendant's claim was so located as to include within its lines most of the space included within the Smoke Stack and St. Lawrence, and also a space to the southwest of these claims and to the east of the Anaconda not included in the surface rights of the three claims through which the vein passed, nor subject to their extralateral rights, but which was within the surface of the Rob Roy. Defendant did not claim any right to follow the vein to such space, but that it belonged to him by appropriation. *Held,* that the ores in such space belonged *prima facie* to the relators, as owners of the Rob Roy, by virtue of comon-law rights, though no part of the apex was within its bounds, and therefore it was error, in an action by the defendant against the relators for removing ores from such space, to grant him an order for the inspection of relators' mines, under Code of Civil Procedure, Secs. 1314, 1315, providing that such order may be made "for good cause shown" pending an action for the recovery of a mine.

2. *Quaere*: Whether a valid location can be made by a trespass upon the surface of lands to which patent has already been issued.

3. The owner of a mining claim holds everything beneath the surface, subject only to the right of an adjoining locator or patentee, who has the apex of a vein and who has complied with the statute, to pursue it on its dip beneath the surface.

4. Constitution, Art. VIII, Secs. 2, 3, give the supreme court general supervisory control over other courts, under such regulations as may be prescribed by law, and confers power to issue and hear writs of *mandamus*, etc., and such other original and remedial writs as may be necessary to the exercise of its appellate jurisdiction. Code of Civil Procedure, Sec. 205, declares that, when jurisdiction is conferred on a court, and the course of proceeding is not specifically pointed out, any suitable process conformable to the spirit of the Code may be adopted. *Held,* that the power of supervisory control was a distinct power, and might be exercised to control the discretion of an inferior court in making an order from which no appeal would lie, and for which the writs appertaining to the appellate jurisdiction furnished no remedy.

5. Where defendant sued relators, alleging that they were removing ore from certain premises the right to which was in defendant, but the evidence showed the the *prima facie* right was in relators, an order granting defendant and his employees right to enter and inspect all of relators' surrounding mines for the period of 40 days for the purpose of obtaining evidence, being an order not appealable nor subject to control by any of the specified writs within the jurisdiction of the court, it was a proper case for the court to exercise the power of "supervisory control" over the inferior court, conferred by Constitution, Art. VIII, Sec. 2.

6. By *mandamus* the supreme court may coerce into activity, but it may not be used to control discretion or to correct errors.

7. By *certiorari* an order made without or in excess of jurisdiction may be annulled or modified when there is no appeal or other adequate remedy; but it cannot be used to correct errors of judgment in the exercise of jurisdiction.

APPLICATION by the state, on the relation of the Anaconda Copper Mining Company and another, for a writ of supervisory control directing the judge of the district court of the

Second judicial district of Silver Bow county and another to reverse an order issued in proceedings therein.   Writ issued.

*Mr. W. W. Dixon, Mr. A. J. Shores, Mr. D. Gay Stivers, Mr. C. F. Kelly* and *Mr. J. K. MacDonald,* for Relators.

*Messrs. Toole & Bach, Messrs. McHatton & Cotter, Mr. J. M. Denny* and *Messrs. Cullen, Day & Cullen,* for Respondents.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the Court.

On December 20, 1899, one Burdette O'Connor brought an action in the district court of Silver Bow county against the Anaconda Copper Mining Company and the Washoe Copper company, corporations, the relators herein, alleging that he was the owner of the Copper Trust lode claim, situate in Silver Bow county, and that the defendants had theretofore trespassed upon his rights therein by entering within its boundaries, and extracting and carrying away ores therefrom to the value of $2,000,000, to his damage in that amount.   Under a separate cause of action incidental relief was sought by way of injunction.   The cause is still pending in the district court, the issues therein not having been made up at the time the present controversy arose.   On March 26, 1901, for the purpose of obtaining evidence to aid him in the trial of said cause, the said O'Connor filed therein a petition asking the court for an order permitting him to inspect and survey all the underground workings in the Anaconda, St. Lawrence, Never Sweat, Rob Roy, Grant, Grant Extension, Parrott, Lot 45 C, and the Cuerpo Bazzo lode claim, and also in the Leggatt and Foster placer claim, all of which the complaint alleges are in possession of defendants, or one of them, and through which defendants had entered upon the ore bodies belonging to the Copper Trust, and committed the trespasses complained of.   The situation of the ore bodies in controversy, as shown by the evidence submitted

to the court at the hearing, and the respective claims of the contending parties, will be readily understood from the subjoined diagram:

The exterior boundaries of the Copper Trust lode are indicated by the heavy lines. This claim overlies the Smoke Stack lode, and most of the surface of the St. Lawrence. It will be noted that all of the claims mentioned, both the Copper Trust and those belonging to the relators, have parallel end lines.

All of the claims belonging to relators are held by patents issued at various times up to and including November 2, 1892, when the patent to the Cuerpo Bazzo claim was issued. It will also be noted that some of the boundary lines of the Smoke Stack claim, as originally located, were laid upon and over the surface included within the lines of the Mountain View and Fairmount, to the north. The patent to the former excludes the conflicting surface. It is admitted by the parties that all of the surface to the south and southwest of the Smoke Stack claim is covered by the patents of relators. The Copper Trust is an unpatented claim. It was located on April 30, 1899, by virtue of an alleged discovery made on that date in the small triangle, then vacant, which is indicated by the letters A, B, 10 feet in width at the base and extending east between the lines of the Johnstown and Mountain View to its apex, a distance of 75 feet. The only other ground embraced within the limits of the Copper Trust not covered by the relators' patents is a small triangle at the point C, between the east end line of the Mountain View and a claim known as the Sullivan, lying immediately to the east. It does not appear whether there is any apex within the exterior boundaries of the triangle last mentioned. The contention made by O'Connor was and is that the vein thus discovered in the first triangle mentioned dips to the south at an angle of about 70 degrees, and passes on its strike through the base of the triangle into the Smoke Stack claim, thence across its south side line into the St. Lawrence, and thence into the Anaconda claim across the west end line of the former at the point D, about 150 feet north of the intersection of this line with the east end line of the latter at the point G. The course of it, under this contention, is indicated approximately by the position of the letters B, A, E, D. O'Connor further contends that under the Copper Trust location he is entitled not only to the surface within his boundaries not covered by the relators' patents, but also to all portions of the lead having their apex therein, as well as to those parts of it which, though they have no apex within his surface, are so

situated with reference to the end lines of relators' claims that the relators may not assert title to them by virtue of their extralateral rights.   In other words, it is asserted that the relators have no extralateral rights upon this vein, either through the Anaconda or the St. Lawrence, south of the intersection of the end lines of these claims at G, and within the triangular portion of the earth included between the vertical planes passing downward through these lines extended in their own direction indefinitely toward the south.   He contends, therefore, that, inasmuch as the relators, in making their locations, did not so lay their lines with reference to the strike of the vein that they could follow it on its dip into this portion of the earth by virtue of their extralateral rights, they failed to appropriate it at all; that it was thus left to be appropriated by any other claimant; and that it belongs to the plaintiff under his location. The position of the relators is that, though they do not have title to the ores in the ground in question by virtue of extralateral rights through the St. Lawrence and the Anaconda, they nevertheless own them, as against O'Connor, at least, by virtue of their common-law rights to the surface and everything beneath, because neither O'Connor nor any one else owns any part of the apex of the vein, which is so situated that extralateral rights through such portion may be asserted to anything beneath the surface owned by them.   Therefore, they say, O'Connor has shown no right to any part of the ores in controversy such as to authorize the court to grant an order permitting him to make the inspection and survey sought.

Upon the facts presented, the court overruled the contention of the relators, and granted the order as prayed.   Under it O'Connor was granted the right to enter into any or all the underground workings in all the claims mentioned belonging to the relators to the south and west of the Smoke Stack claim for the period of 40 days; to employ six engineers and assistants to conduct the work of survey and inspection; and to demand, at reasonable times, of the relators, that he and his said engineers and assistants be lowered into the mines and hoisted

therefrom to the surface whenever he and they should require the same to be done.

The relators, by a verified petition setting forth all the proceedings, including the pleadings in the cause, and all the evidence submitted by the parties, and alleging that O'Connor had not brought his action or made his application to the district court in good faith, applied to this court for relief, asking that this court issue a writ, under its constitutional powers of supervisory control over the inferior courts of the state, directing the district court and its judge to set aside and vacate the order, and to deny the application for an inspection and survey.

The theory of the relators is that upon the facts the district court abused its discretion, and acted arbitrarily, and in plain violation of the legal rights of the relators, in granting the order, and that they are without redress by any other means known to the law.

Under an order to show cause, issued by this court, the respondents appeared by filing an answer denying the charges of bad faith on the part of O'Connor, and also a motion to dismiss the application on several grounds. At the hearing three propositions were urged as conclusive reasons why this court should not interfere, namely: First, because, under our constitution, the power of supervisory control lodged in this court is not self-executing, and the legislative branch of the state government is alone vested with the power to prescribe regulations and limitations under which it may be exercised; second, because the legislature has done so by adopting the only writs allowed by the constitution, except in appellate matters, and because this court is limited to the use of them as thus defined; and, third, because, if, under our constitution, the powers of this court can possibly extend the operation of these writs, or any of them, beyond the limits prescribed by law, no such grave emergency exists in this case as would justify it in thus using any of them.

From an analysis of these propositions it appears that two,

and only two, questions are presented for decision, namely: Was the action of the district court in granting the order erroneous? and: Can this court afford relief, and, if so, what is the proper remedy? We shall consider these in their order, and, incidentally, also the further question whether, if the order is found to have been erroneous, the circumstances present such a case as will justify this court in using any remedy which it may deem available.

Sections 1314 and 1315 of the Code of Civil Procedure, under which the order was made, provide:

"Sec. 1314. The court in which an action is pending for the recovery of real property or mining claims, or for damages for an injury or to quiet title or to determine adverse claims thereto, or a judge thereof, may, on motion, upon notice by either party, for good cause shown, grant an order allowing to such party the right to enter into or upon the property or mining claim, and make survey or measurement thereof, or of any tunnels, shafts, or drifts therein, for the purpose of the action, even though entry for such purpose has to be made through other lands or mining claims belonging to parties to the action.

"Sec. 1315. The order must describe the property, and a copy thereof must be served on the owner or occupant; and thereupon such party may enter the property, with necessary surveyors and assistants, and make such survey and measurement; but if unnecessary damage be done to the property, he is liable therefor."

The purpose of these sections, and a similar provision, found in Section 1317, which, by its terms, seems to apply to cases where no action is pending, but contemplated only, is to enable either of the parties to a controversy over real property, when it is in the possession of his adversary, upon showing that the circumstances of the case require it, to have an examination and survey of it, to the end that he may be put in possession of all the facts touching the controversy, and thus to furnish them to the court, so that the respective rights of the parties

may be properly determined. So wholesome and necessary are the means thus afforded litigants to properly present their rights to the tribunal administering upon them, that it is not surprising to find that these inspection orders have often been made by the courts, both in this country and in England, even in the absence of special statutory authority, under their general powers as courts of equity. An inquiry into the origin and purpose of the rule embodied into the statute, with citation and examination of American and English cases, will be found in *St. Louis Min. & Mill. Co.* v. *Montana Co.*, 9 Mont. 288, 23 Pac. 510, and in the same case, affirmed on writ of error by the Supreme Court of the United States, in 152 U. S. 160, 4 Sup. Ct. 506, 38 L. Ed. 398. The sections of the statute go no further than to declare the rule as it has existed for many years, except that by their terms they extend the rule to all courts, whether sitting as courts of law or equity. It is not our present purpose, however, to discuss the propriety of the legislation. We refer to the statute, and the cases in which the rule has been applied, to show that the district court had ample authority to make the order in question, provided the facts presented at the hearing justified it. Indeed, the order, upon proper showing, is always made almost as a matter of course. The purpose of the statute is to serve the interests of justice, however, and not to be made an instrument of injustice or oppression. Under it the court may not, without a reasonable showing, and in disregard of the rights of the party in possession of the property, or in control of the means of access to it, permit his adversary to enter upon it, merely because he desires and asks for an order permitting him to do so. The law must be administered in the spirit of liberality to accomplish the desired end. Purely technical and captious objections should not be tolerated. The language of the statute is, "for good cause shown," and, under the rule laid down in *St. Louis Min. & Mill. Co.* v. *Monatna Co.*, *supra,* whenever the order is made without good cause, it must follow that it is an infringement on the rights of the party in possession, and may be set aside

as unauthorized; otherwise, the power of the court could be exercised without restraint, and to the great injury and oppression of the party in possession.

With these preliminary observations we proceed to determine, from a consideration of the facts presented to the district court, whether the order complained of was justified. O'Connor does not assert title to any other surface within the boundaries of the Copper Trust claim than the two triangles already mentioned. It is not controverted in this proceeding that the relators are entitled, under their patent, to so much of the vein found within the surface of the triangle A, B, as passes on its strike through the Smoke Stack, the St. Lawrence, and the Anaconda claims, and that in following this vein on its strike to the southwest O'Connor cannot pass beyond the east end line of the Smoke Stack. Indeed, this is apparent from an inspection of the plat. The parallelism of the end lines of the Smoke Stack and St. Lawrence also gives to the relators the right to follow the vein to the south on its dip beyond the vertical planes of the side lines of these claims. Under the Smoke Stack claim the extralateral rights are bounded by the vertical plane of the east end line of the Smoke Stack and St. Lawrence and a parallel vertical plane passing through the point at which the vein crosses the south line of the Smoke Stack into the St. Lawrence. The extralateral rights of the St. Lawrence are bounded by the vertical plane last mentioned and a vertical plane passing downward through the west end line of this claim, for it appears from an inspection of the plat that the area of the surface conflict between the Anaconda and the St. Lawrence belongs to the St. Lawrence claim. It follows, further, as a necessary conclusion, that, so far as O'Connor has any right to follow this vein on its dip from that portion of the apex found within the boundaries of the triangle A, B, this right is limited toward the west by the vertical plane of the east end line of the Smoke Stack and of the St. Lawrence, extended in its own direction. The situation presented by the position and course of the apex, with reference to the lines of

these claims and the rights dependent thereon, have been considered and determined by the following cases: *Fitzgerald* v. *Clark,* 17 Mont. 100, 42 Pac. 273, 30 L. R. A. 803, 52 Am. St. Rep. 665; *Del Monte Min. & Mill. Co.* v. *Last Chance Min. & Mill. Co.,* 171 U. S. 55, 18 Sup. Ct. 895, 43 L. Ed. 72; *Clark* v. *Fitzgerald,* 171 U. S. 92, 18 Sup. Ct. 941, 43 L. Ed. 87; and *Parrot Silver & Copper Co.* v. *Heinze,* 25 Mont. 129, 64 Pac. 326; and all questions arising thereon are now too well settled to admit of further discussion. It is of no moment to inquire what are the extralateral rights of the relators through the Anaconda claim. No part of the surface of that claim is embraced within the boundaries of the Copper Trust, and therefore we shall not stop to consider them, except to remark that, whatever rights the relators have to follow the vein on its dip from the point where the apex passes into that claim, they cannot extend further east than the vertical plane of its east end line. Stated succinctly, the question to be determined is: What right, if any, has O'Connor, by virtue of the Copper Trust location, to assert title to the ores lying underneath the earth within the triangle the apex of which is at G? He does not contend that he has any right to follow the vein from the part of the apex within the triangle A, B, through the intervening space, about 1,300 feet, either on or beneath the surface of the St. Lawrence. As we have already stated, his claim is that, as no part of the ore bodies in controversy is situated within the surface boundaries of the St. Lawrence claim, no part of them belongs to that claim, and, as the relators may not claim this portion of the vein through the St. Lawrence or the Anaconda by means of their extralateral rights, they were not, in contemplation of the mining laws, appropriated by the relators through any of their locations, and therefore belong to O'Connor by appropriation under the Copper Trust, although he has no part of the apex by which he may follow the vein on its dip from the surface. In support of his contention, counsel for respondents cite the *Del Monte Case, supra,* as decisive. We do not so understand it. Among other questions decided in

that case it was distinctly held that any of the lines of a junior location may be laid within, upon, or across the surface of a valid senior location for the purpose of defining for or securing to such junior location underground or extralateral rights not in conflict with any rights of the senior location. The question presented here did not arise, and was not decided. Referring to the diagram used to illustrate the contentions of the parties and the different directions of the lines pointed out in the opinion, it appears that upon an extension of the vertical plane of the north end line of the New York claim in its own direction a triangular portion of the vein would be left between it and the vertical plane of the line bounding the extralateral rights of the Last Chance to the south, entirely beyond the vertical plane of the surface lines of any of the conflicting claims. The court says, with reference to the title to this portion of the vein: "In other words, referring to the first diagram, the inquiry is not whether the owners of the Last Chance have a right to pursue the vein as it descends into the ground south of the dotted line r, s, even though they should reach a point in the descent in which the rights of the owners of the New York, the prior location, have ceased. It is obvious that the line e, h, the end line of the New York claim, extended downward into the earth, will at a certain distance pass to the south of the line r, s, and a triangle of the vein will be formed between the two lines, which does not pass to the owners of the New York. The question is not distinctly presented whether that triangular portion of the vein up to the limits of the south end line of the Last Chance, b, c, extended vertically into the earth, belongs to the owners of the Last Chance or not, and therefore we do not pass upon it. Perhaps the rights of the junior locator below the surface are limited to the length of the vein within the surface of the territory patented to him, but it is unnecessary now to consider that matter. All that comes fairly within the scope of the question before us is the right of the owners of the Last Chance to pursue the vein as it dips into the earth westwardly between the line a, d, t, and the line r, s, and to

appropriate so much of it as is not held by the prior location of the New York, and to that extent only is the question answered. The junior locator is entitled to have the benefit of making a location with parallel end lines. The extent of that benefit is for further consideration." The court does say, as defendants claim, that the portion of the vein referred to does not pass to the owner of the New York. Obviously, this is a correct conclusion, for, under no circumstances, would the extralateral rights of the New York extend northward beyond the vertical plane of its north end line. With equal distinctness is the question of the rights of the Last Chance to any of that portion of the vein reserved. Nowhere in the opinion do we find any support for the contention that the junior locator acquires any right to any portion of a vein beneath the surface of the senior location by laying his lines upon, over, or across its surface, except that by this means he may secure parallelism of his end lines, and, through this parallelism, extralateral rights to the extent of the length of the vein found within the surface for which he may receive patent. We doubt seriously whether the court intended to be understood as declaring it to be the law that a junior locator may lay his lines, in part or wholly, upon and over the surface of claims already patented, and secure any rights thereby. After patent has issued, the legal title to the land conveyed by it has passed wholly from the government. The holder of this title is wholly beyond the jurisdiction of the land department; and it would seem that no one can initiate by trespass upon his tract any right whatever, whether it be committed ignorantly or not. It does not appear distinctly from the opinion in the *Del Monte Case* whether any of the claims were patented at the time the conflict arose. If the law is as counsel contend, then a patent does not convey an absolute estate, but only a qualified fee, and leaves the land still subject to some rights in the government,—a doctrine for which there seems to be no warrant in the statute. So long as land is not patented, the legal title is still in the government; and it may be argued with some force that, while held under

a location merely, it is still within the jurisdiction of the land·
department, and for that reason it is within the province of its
authority to say that a junior locator may lawfully go upon
it, and mark his boundaries and erect his monuments upon its
surface, in order to initiate rights in lands not covered by it.
This seems to be the theory upon which the court proceeds in
the *Del Monte Case;* for the argument upon which its conclu-
sion on this point in the case is based is found on pages 73-85,
171 U. S., pages 902-907, 18 Sup. Ct., and pages 80-84, 43
L. Ed., and nowhere therein do we find any reason stated which
would apply with any force to locations made by a trespass
upon the surface of lands to which patent had already been
issued.

The only authority called to our attention which distinctly
sustains the contention of counsel as to the validity of the Cop-
per Trust location is the decision in *In Re Hidee Gold Min.
Co.,* rendered by Secretary Hitchcock on January 30, 1901.
In this decision the secretary distinctly sustains the conten-
tion of counsel for the defendants on this point.    We quote
from the headnote of his opinion: "The location lines of a lode
mining claim are used only to describe, define and limit prop-
erty rights in the claim, and may be laid within, upon or across
the surface of patented lode mining claims for the purpose of
claiming the free and unappropriated ground within such lines
and the veins apexing in such ground, and of defining and secur-
ing extralateral underground rights upon all such veins, where
such lines (a) are established openly and peaceably, (b) do not
embrace any larger area of surface, claimed and unclaimed,
than the law permits."    Even he limits the validity of such
locations to cases where the lines are established openly and
peaceably.    We do not understand, however, how the United
States government may convey any right to lands by consent
of an adjoining owner under patent, which it could not convey
without such consent.    As we have said, we have grave doubts
as to the soundness of the conclusion of Secretary Hitchcock.
But conceding, for the present discussion, that it is the law,

there is nothing in the *Del Monte Case* nor in the opinion of the secretary to support the contention of counsel that O'Connor acquired by his location of the Copper Trust ownership of any part of the vein in question which underlies the Rob Roy claim, or any of the claims to the south. In the *Del Monte Case* the extralateral rights claimed by the Last Chance were asserted as to that portion of the vein the apex of which was found within that part of the surface of the Last Chance not covered by any previous location. The case goes only to the extent of deciding that, as the Last Chance had parallel end lines, and the vein passed through them, it had extralateral rights as to that portion of the apex not covered by either of the other conflicting locations. The *Hidee Case* involved only the validity of a location the lines of which were laid upon, over and across the surface of the claims already patented, so as to secure all the rights appertaining to the unappropriated intervening surface. Certain expressions found in these cases in which reference is made to underground rights would seem to lend support to the contention of counsel, but, when they are considered in the light of the particular rights under discussion, they have no pertinency to the question presented in this case. The same may be said of *Crown Point Mining Co.* v. *Buck*, 38 C. C. A. 278, 97 Fed. 462. Suppose, for instance, there had been no vacant surface within the boundaries of the Copper Trust location, would it be contended for a moment that O'Connor has any rights whatever under it? A discovery of a vein upon unoccupied land is absolutely essential to the validity of a location. There must be a surface right; without this no right to the lode can be established. The statutes do not authorize the land department to convey a lode independently of the surface ground connected with and containing or overlying it. This is the conclusion stated by this court in *Montana Ore Purchasing Co.* v. *Boston & M. Consol. Copper & Silver Min. Co.,* 20 Mont. 337, 51 Pac. 159, in a case in which the plaintiff claimed under a patent which attempted to convey a small portion of surface covered by the Rarus location, together with

1,318 linear feet of the lode, which had its apex in, and under-lay the surface of, the Johnstown, a conflicting claim. The patent was held to be unauthorized and void as to the portion of the ledge not underlying the surface conveyed by it. This court said: "It is no doubt true that those statutes, taken as a whole, give greater prominence verbally to the lode or vein than to the surface connected therewith; but this naturally results from the fact that the lode is the main subject treated. Such expressions and such prominence, however, cannot avail to permit the grant of lodes or veins embraced in a located quartz claim, regardless of the surface connected therewith." The same view is stated by Mr. Lindley in his work on Mines in section 780. It is only by virtue of an apex found within the surface of any claim having parallel end lines that an owner may assert the right to enter beneath the surface of his neighbor. This is the evident meaning of Section 2322 of the United States statutes. Neither this section nor any other pro-vision of the statute authorizes or provides a way for the ap-propriation of any portion of a lode without some portion of the surface through which it may be reached. Should a patent issue to O'Connor, under the *Del Monte* and *Hidee* Cases it would issue for the whole surface within the Copper Trust boundaries, excluding all those portions covered by the relators' patents. Under the principle of the case of *Montana Ore Pur-chasing Co.* v. *Boston & M. Consol. Copper & Silver Min. Co., supra,* and as stated by Mr. Lindley, this would *ipso facto* exclude the ore bodies lying within the disputed triangle. Again, the title to a mining claim carries with it all the rights inci-dent to a title in fee at the common law, except in so far as it is enlarged or limited by the statute. This court, in *Parrot Silver & Copper Co.* v. *Heinze,* 25 Mont. 139, 64 Pac., at page 329, in considering such rights, said: "The patent grants the fee, not to the surface and ledge only, but to the land contain-ing the apex of the ledge. The right to follow the ledge upon its dip between the vertical planes of the parallel end lines extending in their own direction, when it departs beyond the

vertical planes of the side lines, is an expansion of the rights which would be conferred by a common-law grant. On the other hand, this grant is subject to the right of an adjoining locator to follow his vein upon its course downward beneath the surface included in the grant. In these two respects only do the rights conferred by the statute differ from those held under a common-law grant." Therefore, viewed merely as land with the ordinary incidents of ownership, the owner holds everything beneath the surface, subject only to the right of an adjoining locator or patentee, who has the apex of a vein, and who has complied with the statute, to pursue it on its dip beneath the surface. O'Connor has no part of the apex of the vein so situated with reference to the ore bodies within the triangle that he may pursue the vein from the surface. He cannot acquire any portion of the surface belonging to the relators; neither can he pass through the St. Lawrence from the point at which he made his discovery, or from any point within any of the surface owned by him. He is therefore not in a position, by virtue of his location, to maintain his claim to the ores in controversy. Under the principle of *Parrot Silver & Copper Co.* v. *Heinze, supra,* and upon the undisputed facts presented upon this application, they belong *prima facie* to the relators, as owners of the Rob Roy claim, and others to the south by virtue of their common-law rights. See, also, *Calhoun Gold Min. Co.* v. *Ajax Gold Min. Co.* (decided May 27, 1901), 182 U. S. 499, 21 Sup. Ct. 885, 45 L. Ed. ——. It thus appears that the order of the district court, based, as it was, upon a state of facts showing *prima facie* that O'Connor has and can have no interest in the property which he seeks to inspect, was not justified.

This brings us to the consideration of the question: What remedy, if any, may this court afford? Counsel for defendants have filed an elaborate brief, in which they challenge the power of this court to interfere. They argue with much force that, though this court has, under the constitution, the power invoked in this proceeding, it can be exercised only "under such

regulations and limitations as may be prescribed by law;" that the authority to issue the six original writs enumerated in the constitution and defined by the Code is a denial of the power to issue any other writ; and that the power invoked must be exercised, if at all, under some one of these writs as they have been defined by the statute. In *State ex rel. Whiteside* v. *District Court,* 24 Mont. 539, 63 Pac. 395, we endeavored to point out, by what we deemed a proper construction of Sections 2 and 3 of Article VIII of the Constitution, that under that instrument there are four distinct grants of power, viz., appellate jurisdiction, a general supervisory control over all inferior courts, discretionary power to issue, hear and determine the various original writs enumerated, and the power to issue, hear and determine such other original and remedial writs as may be necessary to the complete exercise of the appellate jurisdiction. We also endeavored to define and point out the functions of these various powers so that each might be assigned its appropriate office within the purview of the constitution, and at the same time not to be permitted to encroach upon the functions of any other. The offices of the original writs authorized were discussed and defined, and it was pointed out that they were put into the hands of this court for prerogative uses, and not as aids to the appellate jurisdiction; following the previous decisions of this court in *In re MacKnight,* 11 Mont. 126, 27 Pac. 336, 28 Am. St. Rep. 451, and *State ex rel. Clarke* v. *Moran,* 24 Mont. 433, 63 Pac. 390. It was further pointed out that these writs are not adapted to supervisory uses, for that they may not properly be wrested from their well-known and well-defined uses at the common law, which were inherent in them as adopted into the constitution. The power of supervisory control was discussed, and a tentative definition of its functions laid down, so that it might not be confounded with the other powers granted, and the clause granting it be thus rendered meaningless. The means at our disposal for its exercise were likewise discussed, and it was found that the legislature, so far as action by that body was necessary, had provided such means.

After studying the argument of the learned counsel in this case, and upon further consideration of the subject, we are confirmed in the conclusions reached in that case, not only that the power is distinct and independent of any other power granted, but that, from its nature, it must be exercised by means of instrumentalities distinct from those by which the others are made available. Counsel would have us conclude that the power must be exercised through the writ of *mandamus, certiorari,* or some other one of the original writs enumerated, because the constitution has authorized these writs, and they have been defined by law. A complete answer to this position is found in the proposition—the correctness of which is apparent upon a moment's consideration—that, in so far as this court can use these as original writs, it is entirely free from limitation or control by the legislature. The power to issue and to hear and determine them is lodged entirely within the discretion of this court, subject only to the limitations fixed for them in the constitution itself, or by usage at the time the constitution was adopted. (*State ex rel. Scharnikow* v. *Hogan,* 24 Mont. 379, 62 Pac. 493.) For this court to recognize any other limitation would be a violation of its duty to the same extent as if it should usurp powers not granted to it. Further than this, if we should sustain counsel in their position, the result would be to confound what they admit are two separate grants of power by assigning to the one the functions of the other.

Counsel suggest that the construction and application this court has given to Section 205 of the Code of Civil Procedure in *State ex rel. Whiteside* v. *District Court, supra,* amounts to a usurpation of power on the part of this court, in that, by holding that this section leaves this court to adopt its own procedure and process, the court has assumed to declare the "regulations and limitations" under which the power may be invoked and exercised,—a function which belongs exclusively to the legislature. The section referred to provides: "When jurisdiction is, by the constitution or this Code, or any other statute, conferred on a court or judicial officer, all the means necessary

to carry into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code." The fault, if any, to be found with this provision is chargeable to the legislature, and not to this court. The legislature may not have enacted the wisest measure in thus leaving it to this court to adopt its own procedure and process, still this court may not be justly charged with going beyond its powers if its seeks to execute the will of the legislature as thus declared. We are satisfied with the construction given the section cited, deeming it a sufficient declaration of the legislature to authorize the use of the power in its utmost vigor.

The statute does not provide any appeal from the order, and, if any relief is to be obtained, it must be granted by an exercise of the power invoked. Neither *mandamus* nor *certiorari* will lie. By the former this court may coerce into activity, but it may not be used to control discretion, or to correct errors. By the latter an order made without or in excess of jurisdiction may be annulled or modified when there is no appeal or other adequate remedy. It cannot be used to correct errors of judgment in the exercise of jurisdiction. It could not be invoked to annul the order in question, for the reason that the order was made in the exercise of jurisdiction. The district court is authorized by law to hear all such applications, and to determine the question presented, namely, whether the showing made is sufficient. Necessarily, it also has the power to decide wrong as well as right.

Do the circumstances of this case show such an emergency as to warrant interference by this court? Unless the order be set aside, it will be executed at once. An appeal from a final judgment in the case would be ineffectual. By that time the relators will have been subjected to all the burdens of expense and inconvenience incident to the execution of the order. By its terms, O'Connor and his employees are for forty days per-

mitted to enter and inspect and survey any or all of the workings of the relators, whether in the claims adjacent to or remote from the ore bodies claimed by him; and that, too, in face of the fact that upon his showing he has no interest to be protected thereby. Counsel say that, even if this be the case, yet no great harm will be done. This may be true; nevertheless the order, without lawful reason, puts the property of the relators practically under the power of O'Connor, to be used at his pleasure for forty days, and compels the relators to furnish him with the means of ingress and egress at such times as he may reasonably require. Every citizen holds his property subject to the power of the state to prescribe reasonable regulations for the protection of the property and rights of others. This principle must always be recognized and enforced. The statute is itself a recognition of it, and, when properly applied, is a wholesome means for its enforcement. When misapplied, it becomes, as in this instance, a means of injustice and oppression; and a refusal by this court, with the views we entertain, to use its power to prevent the threatened wrong, would be a betrayal of the trust reposed in it by the constitution.

A writ will therefore issue, under the seal of this court, in the form of a peremptory order directing the district court and its judge to set aside the order made and entered on May 20, 1901.

Nothing we have said in this opinion is to be construed as a final adjudication of the rights of the parties in the case of O'Connor against the relators. What we have said is upon the undisputed facts as they appear in *this record*.

*Writ granted.*