STATE OF NORTH DAKOTA, Plaintiff, *v.* NELSON COUNTY, Defendant.

### 1. Constitutional Law; Seed-Grain Bonding Law Valid.

An act approved February 14, 1890, entitled "An act authorizing counties to issue bonds to procure seed-grain for needy farmers resident therein," examined and held to be valid, and not an abuse of legislative powers, in that it authorizes the issue of bonds and taxation for a public purpose. *Held, further,* that the act is not an infringement of § 185 of the state constitution, in this: that it is a measure intended for the "necessary support of the poor."

## 2. Same; Original Jurisdiction of Supreme Court.

In the exercise of its original jurisdiction, under § 87 of the state constitution, the supreme court, exercising its discretion, will issue the writs of *habeas corpus, mandamus, quo warranto, certiorari* and injunction only when applied for as prerogative writs; and where the question presented is *publici juris,* and one affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of the people. To invoke the original jurisdiction of this court, the interest of the state must be primary and proximate, and not secondary and remote. This court will judge for itself whether the wrong complained of is one which requires the interposition of this court to protect the prerogatives and franchises of the state in its sovereign character. In all cases where the original jurisdiction of this court is invoked, except in *habeas corpus* cases, the attorney general shall proceed only on leave, based upon a *prima facie* showing that the case is one of which it is proper for this court to take cognizance. In ordinary cases, this court will not exercise its original jurisdiction to restrain local taxation for any reason. The proper jurisdiction for that purpose is lodged in the district courts. *Held,* this being an application made by the attorney general in behalf of the state to enjoin the issue of bonds upon the alleged ground that the statute authorizing the bonds is unconstitutional, that the question is one of local concern, and affects only the county of Nelson and its tax-payers, and hence the case does not fall within the limited class of cases in which this court will exercise original jurisdiction. *Held,* that the writ of injunction is denied upon the ground that the statute in question is valid law, and also upon the ground that the question presented is one of merely local concern, and hence is not a proper case to call for the issuing of a writ out of this court.

(Opinion Filed April 21, 1890.)

*T*HIS is a proceeding brought in the supreme court by application made for leave to file an information in order to procure an injunction restraining defendant from issuing seed-grain bonds.

No briefs were filed.

*George F. Goodwin,* Attorney General, and *Burke Corbett,* for the motion. *M. N. Johnson,* States Attorney, and *F. R. Fulton,* opposed.

WALLIN, J. Upon the return of an order to show cause, application is made to this court for leave to file an information as a foundation for issuing a writ of injunction out of this court prohibiting the county of Nelson and its officials from issuing

seed-grain bonds, under an act of the state legislature, approved February 14, 1890, and entitled : " An act authorizing counties to issue bonds to procure seed-grain for needy farmers resident therein." The information is based upon the complaint of one John Birkholz, which alleges—"*First.* That the above-named complainant, John Birkholz, is a tax-payer of the county of Nelson, the respondent above named. *Second.* That said respondent is a political or public corporation, duly organized under existing laws. *Third.* That J. W. Forbes is the duly elected and qualified chairman of the board of county commissioners, and N. F. Webb is the duly-elected county auditor of Nelson county, and as such officers are respectively discharging the duties thereof. *Fourth.* That the above-named respondent on the 26th day of March, 1890, acting through its board of county commissioners and the county auditor of said county, pursuant to a petition signed by 100 freeholders resident in said county, adopted and passed a resolution at a meeting of said board, and thereby resolved to issue the bonds of the said county in the sum of twenty thousand dollars ($20,000), payable in ten (10) years, and bearing interest at the rate of seven (7) per cent. per annum, payable semi-annually, claiming their right to so do under an act of the legislative assembly entitled 'An act authorizing counties to issue bonds to procure seed-grain for needy farmers resident therein,' approved February 14, 1890, and acts amendatory thereto; that in pursuance to said resolution said respondent, acting through its auditor and the chairman of its board of county commissioners, have taken such steps as are requisite and necessary in the premises to and are about to issue bonds for said amount, in pursuance of said resolution, claiming their right to do so under the act aforesaid. *Fifth.* That if said bonds are issued they will become the obligation of the county. In order to meet the payment of the interest thereon, and the payment of the principal of the same, it will be necessary to levy taxes from year to year against the tax-paying people of said county, and the proceeds of said bonds, when issued and sold by the said county, will be diverted to and used for the purpose of buying said grain, to be distributed to private individuals, indigent and poor farmers resident in said county.

*Sixth.*    That the act of the legislative assembly aforesaid, under which said respondent claims its right to issue said bonds, is in contravention of § 185 of the constitution of the state of North Dakota, which said section reads as follows: '§ 185.  Neither the state, nor any county, city, township, town, school-district, or any other political subdivision, shall loan or give its credit, or make donations to or in aid of any individual, association or corporation, except for necessary support of the poor, nor subscribe to or become the owner of the capital stock of any association or corporation, nor shall the state engage in work of internal improvement, unless authorized by a two-thirds vote of the people.' Wherefore your complainants pray your honorable court that an order in the nature of a rule to show cause be issued to the said respondent, its officers, agents, and servants, to be and appear before your honors, at Fargo, in the county of Cass and state of North Dakota, at the opening of court thereof on Wednesday, the 2d day of April, A. D. 1890, and then and there show cause, if any reason it has, why an injunction should not be issued restraining respondent from issuing the bonds aforesaid."

It clearly appears from the complaint that the county of Nelson has, under the provisions of the seed-grain act in question, taken all of the requisite preliminary steps, and is about to issue the bonds of the county, and sell the same; and will apply the proceeds of such sale to the purchase of seed-grain for such farmers of that county, as come within the terms of the seed-grain law, and who make application for the seed-grain under oath, and in manner and form as prescribed by the law. It is conceded that all action taken by the defendants is warranted by the express terms of the law; nor is it pretended that the bonds if issued, will create a county indebtedness exceeding in amount the limit prescribed by the constitution of the state.    Under such circumstances, the writ of injunction will be refused, as a matter of course, unless the statute under which the bonds are intended to be issued is itself unconstitutional or void for some reason.    The question presented must turn upon the validity of the seed-grain statute.

The statute has twenty sections, but it will suffice to give the substance of such of its provisions as bear upon its validity as

a law.  § 1 provides as follows: "In any county of the state where the crops for any preceding year have been a total or partial failure by reason of drought, hail or other cause, it shall be lawful for the board of county commissioners of such county to issue the bonds of the county under and pursuant to the provisions of this act, and, with the proceeds derived from the sale thereof to purchase seed-grain for the inhabitants thereof who are in need of seed-grain, and who are unable to procure the same, whenever said board shall be petitioned in writing so to do by not less than 100 freeholders resident in the county; and said board, at a meeting called as hereinafter provided. to consider said petition, shall, by a majority vote determine that the prayer of the petitioners shall be granted; provided, that all such petitions shall be filed with the county auditor or county clerk on or before the 28th day of February; and thereupon it shall be the duty of said officer to forthwith call a meeting of the board of county commissioners of his county to consider said petition; and provided further, that the total amount of bonds issued by any county under the provisions of this act shall not, with the then existing indebtedness of the county, exceed the limit of indebtedness fixed by the constitution in such case."  § 4 provides: "The proceeds arising from the sale of said bonds shall be paid by the purchaser thereof to the county treasurer of the county, or to his authorized agent at the time of the delivery thereof, and such proceeds shall be paid out only on the order of the board of county commissioners."  § 6 provides that, "for the purpose of securing prompt payment of the principal and interest of said bonds there shall be levied by the board of county commissioners, at the time and in the manner that other taxes are levied, such sums as shall be sufficient to pay such interest, and in addition thereto a sinking fund tax shall be annually levied sufficient to pay and retire said bonds at their maturity, and it shall be the duty of the county treasurer to pay promptly the interest upon said bonds as the same shall fall due.  No tax or fund provided for the payment of such bonds, either principal or interest, shall at any time be used for any other purpose."  § 7 is as follows: "The fund arising from the sale of said bonds shall be applied exclusively by said board for

the purchase of seed grain for residents of the county who are poor and unable to procure the same; provided, that no more than 150 bushels of wheat, or its equivalent in any grain, shall be furnished to any one person." § 8 provides that "all persons entitled to or wishing to avail themselves of the benefit of this act shall file, with the county auditor or county clerk of the county where said applicant resides, on or before the 1st day of March, an application duly sworn to before said county auditor or clerk, or some other officer authorized to administer oaths. Said application shall contain a true statement of the number of acres the applicant has plowed or prepared for seeding; how many acres the applicant intends to have plowed and prepared for seeding; how many bushels and what kind of grain he will require to seed the ground so prepared as aforesaid; how many bushels of grain the applicant harvested in the preceding year; that the applicant has not procured, and is not able to procure, the necessary seed-grain for the current year; that he desires the same for seed, and no other purpose; and that he will not sell or dispose of the same, or any part thereof, but will use the same, and the whole thereof, in seeding the land so prepared, or to be prepared for crop." § 9 provides that the commissioners shall examine all applications and determine "who are entitled to the benefits thereof, and the amount to which each applicant is entitled." § 10 provides that the applicants under the act shall, before receiving the seed grain, sign a "contract in duplicate, attested by the county auditor or county clerk, to the effect that said applicant, for and in consideration of —— bushels of seed-grain received from —— county, promises to pay to said county —— dollars, the amount of the cost of the seed grain; that said sum shall be taxable against all the real and personal property of said applicant; that such tax shall be levied by the county auditor or county clerk of his county, and collected as other taxes are collected under the laws of this state; that the amount of such indebtedness shall become due and payable on the 1st day of October, in the year in which said seed-grain is furnished, together with the interest on such amount from the 1st day of April of that year at the rate of 7 per cent. per annum; and, if said in-

debtedness be not paid on or before the 20th day of October of that
year, it shall then be the duty of the county auditor or county
clerk of the said county to cause the amount of said indebted-
ness to be entered upon the tax-list of said county for that year
as a tax on the land on which said seed-wheat was sown, and
upon any other land owned by the applicant, to be collected
as other taxes are; and the sum so entered and levied shall be a
lien upon the real estate owned by such person until said in-
debtedness is fully paid, when it shall be the duty of the proper
officer to cancel the same."

The objects and purposes contemplated by the statute may
be readily gathered from the above extracts, and they are clear
and unmistakable in their character. The legislature by this
enactment, so far as it can do so, has clothed the several coun-
ties of the state where there has been a preceding crop failure
with authority to lend their aid in procuring seed-grain to such
of their citizens as are engaged in farming pursuits, who make
it appear, in manner and form as detailed by the law, that they
are unable to procure such seed-grain by any other means.
The law empowers the counties to lend their aid out of money
to be obtained by the issue and sale of county bonds, such bonds
to be paid, principal and interest, from funds obtained by means
of a general tax levy upon all of the taxable property situated
within the counties that issue such bonds. Two features of
this statute stand out in conspicuous prominence. *First.* All
benefits obtainable under the act are confined to persons en-
gaged in the pursuit of farming, and among farmers only those
who propose to continue the business of farming after the aid
in contemplation has been received by them. *Second.* No
part of the fund is intended to be used in support or aiding
such indigent persons as have already become a county charge,
viz., paupers.

The objections which may be made to the validity of this
statute are twofold: *First,* it may be claimed that the tax au-
thorized by the statute is not for a public purpose, hence
not a valid tax; *second,* it may be contended that, un-
der § 185 of the state constitution, counties are expressly
forbidden to make donations, or lend their aid to either

corporations or individuals, hence that the proposed aid is unconstitutional, as repugnant to said section. The courts of this country, and of all countries where constitutional liberty exists, agree with the elementary writers upon the science of government that it is essential to the validity of a tax that it be laid for a public purpose. Difficulty has frequently arisen in discriminating between public and private objects; but where the object is primarily to foster private enterprises, and the only benefit to be derived by the public is incidental and secondary, the tax will be annulled by the courts as an abuse of the legislative prerogative. In the first instance the duty devolves upon the legislative branch of the government to determine whether a proposed tax is or is not for a public purpose; and courts are loth to interpose and declare any tax unlawful, and will only do so in case of a palpable disregard of the wise limitations, express and implied, restricting the power of taxation. But where the legislature assumes, in the guise of taxation, to compel A. to advance his private means to aid B. in the prosecution of a purely private enterprise, the courts will not hesitate to perform the duty of declaring such tax void, as subversive of fundamental and vested individual rights, and will do so even in cases where there is no express constitutional inhibition. The power of confiscation does not exist in the legislature. The cases cited below are but a few of the numberless cases which have applied these principles to statutes imposing pretended taxes. Association v. Topeka, 20 Wall. 655; Bank v. City of Iola, 2 Dill. 353; City of Parkersburg v. Brown, 106 U. S. 487, 1 Sup. Ct. Rep. 442; Cole v. City of LaGrange, 113 U. S. 1, 5 Sup. Ct. Rep. 416; Allen v. Jay, 60 Me. 124; Lowell v. Boston, 111 Mass. 453; State v. Osawkee Tp., 14 Kan. 422; Coates v. Campbell, (Minn.) 35 N. W. Rep. 366; Cooley, Const. Lim. (marg.) p. 487; Cooley, Tax'n, (2d Ed.) pp. 55, 126.

Under these authorities, the test to be applied to the seed-grain statute is this: Is the tax provided for in the statute laid for a public purpose? If this question is answered in the negative, the statute must be declared null and void, without reference to § 185 of the state constitution, to which the attention of the court has been particularly directed. The statute makes

provision for levying a general tax, in counties issuing the bonds, for the benefit of a numerous body of citizens, who, without fault of theirs, and solely by reason of successive crop failures, are now reduced to extremities, and are in fact impoverished to such an extent that they are, for the present time, wholly without the ability to obtain the grain necessary for seeding the lands from which they derive the necessaries of life. It is agreed on all sides that this class of citizens, having already exhausted their private credit, must have friendly aid from some source in procuring seed-grain, if they put in crops this year. The legislature, by this statute, has devised a measure which seems well adapted to meet the exigency, and promises to to give the needed relief, with little prospect of ultimate loss to the county treasuries. It is reasonable to anticipate that the beneficiaries of the act will be enabled to tide over their present embarrassments, and, through the aid granted them by this statute, a wide spread calamity, both public and private, will be averted. The crisis in the development of the state which renders some measure of wholesale relief imperatively necessary is fully recognized by all well-informed citizens of the state, and this court will be justified in taking judicial notice of the existing *status.* The stubborn fact exists that a class of citizens, numbered by many thousands, is in such present straits from poverty, that unless succored by some comprehensive measure of relief they will become a public burden, in other words, paupers, dependent upon counties where they reside for support. It is to avert such a wide-spread disaster that the the seed-grain statute was enacted, and it should be interpreted in the light of the public danger which was the occasion of its passage. "The support of paupers, and the giving of assistance to those who by reason of age, infirmity, or disability are likely to become such, is, by the practice and the common consent of civilized countries, a public purpose." Cooley Tax'n (2d Ed.) pp. 124, 125. "The relief of the poor—the care of those who are unable to care for themselves—is among the unquestioned objects of public duty." Opinion of Brewer, J., in State v. Osawkee Tp., 14 Kan. 424. If the destitute farmers of the frontier of North Dakota were now actually in the alms-houses of the various

counties in which they reside, all the adjudications of the courts, state and federal, upon this subject, could be marshaled as precedents in support of any taxation, however onerous, which might become necessary for their support. But is it not competent for the legislature, representing the tax-payers, in the exercise of its discretion, and within the limits of county indebtedness prescribed by the state constitution to clothe county commissioners with authority to be exercised at their discretion, to make small loans, secured by prospective crops, to those whose condition is so impoverished and desperate as to reasonably justify the fear that, unless they receive help, they and their families will become a charge upon the counties in which they live?

. .We have carefully examined the authorities above cited, and many others of similar import, and while fully assenting to the principles enunciated by the cases, viz., that all taxation must be for a public purpose, we do not, with the single exception of the Kansas case, regard them as parallel cases, and applicable to the question presented in the case at bar. As we view the matter, the tax in question is for a public purpose, *i. e.*, a tax for the "necessary support of the poor." The case of State v. Osawkee Tp., *supra*, asserts a doctrine which would defeat the tax in question. This court has great respect for the court which promulgated that decision, and the most sincere admiraation for the distinguished jurist now upon the supreme bench of the nation, who wrote the opinion in that case. Nevertheless we cannot yield our assent to the reasoning of the case, leading to the conclusion that a loan of aid to an impoverished class, not yet in the poor house, is necessarily a tax for a private purpose. In our view, it is not certain, or even probable, in the light of subsequent experience in the west, that the court of last resort in the state of Kansas would enunciate the doctrine of that case at the present day. The decision was made fifteen years ago. While the fundamental principles which underlie legislation and taxation have not changed in the interval, it is also true that the development of the western states has been attended with difficulties and adverse conditions which have made it necessary to broaden the application of fundamental principles to meet the new necessities of those states. Under

the stress of adversity peculiar to the condition of the frontier farmer, there has come to be an expansion of the legal meaning of the term "poor" sufficient to embrace a class of destitute citizens who have not yet become a public charge. The main features of the seed-grain statute are neither new nor novel. It was borrowed from territorial legislation, and long prior to that the state of Minnesota, in aid of agricultural settlers upon its western frontier, enacted a series of statutes which are open to every criticism which can be made upon the statute under consideration. Chapter 43, Laws Dak. 1889. See also, pp. 1024-1030, Gen. St. Minn. 1878.

The legislature of Minnesota has frequently, and by a variety of laws, extended aid to the frontier farmers of that state, who, far from being paupers, were yet reduced to extremities, by reason of continued crop failures resulting from hailstorms, successive seasons of drought, and from the ravages of grasshoppers. Under one law, towns are authorized to vote a tax to defray the expense of destroying grasshoppers; under another statute, the governor, state auditor, and state treasurer were authorized to borrow $100,000 on state bonds, to be issued by them, and the proceeds were to be expended in the purchase of seed-grain for the needy farmers. Again, and at the same session, the same state officials were empowered to issue additional bonds to the same amount, to pay a debt contracted for a similar purpose, upon warrants of the state auditor. § 6 of the Minnesota act of 1878, c. 93, provides as follows: "The credit of the state is hereby pledged to the payment of the interest and principal of the bonds mentioned in this act, as the same may become due." By another section the state auditor is authorized and required to levy an annual tax necessary to meet the interest and principal of the debt created by these bonds. Many of the features of the two seed-grain statutes passed at the first session of the legislature of this state are borrowed from Minnesota. In principle, the legislation of the two states is identical. The aid extended is furnished in the form of a loan to individual farmers, secured on their crops, but to be met primarily by taxation. The destitute communities of farmers who were thus assisted in a neighboring state

were enabled thereby to tide over their temporary necessities, and are now self-supporting.

This review of legislation in aid of destitute farmers will serve to illustrate the well-known fact that legislation under the pressure of a public sentiment, born of stern necessity, will adapt itself to new exigencies, even if in doing so a sanction is given to a broader application of elementary principles of government than have before been recognized and applied by the court in adjudicated cases. It is the boast of the common law that it is elastic, and can be adjusted to the development of new social and business conditions. Can a statute enacted for such broadly humane and charitable purposes be annulled by another branch of the government as an abuse of legislative discretion? We think otherwise. Great deference is due from the courts to the legislative branch of the state government, and it is axiomatic that in cases of doubt the courts will never interfere to annul a statute. Cooley, Const. Lim. marg. p. 487.

It will be presumed that the legislature, in passing the seed-grain statute, acted upon the fullest knowledge of the necessities of the situation, and also presumed that, they have passed the statute after due deliberation and with the clearest apprehension of the scope and purpose of the language used in § 185 of the state constitution. That section is not only restrictive upon counties, but it is also permissive. It permits counties to lend aid for "the necessary support of the poor." To our mind, the restrictive words of that section were intended to prevent the loan of aid either to individuals or corporations, for the purpose of fostering business enterprises, either of a public or private nature; but that the people who adopted the constitution, as well as those who framed the instrument, expressly intended by the language of that section to grant a power affirmatively to the municipal corporations named in § 185, to lend their aid and make donations for the "necessary support of the poor." The attention of the court has been directed to the constitutions of nineteen of the states, in which the language of § 185 is used verbatim, except only that in the states of North and South Dakota the words above quoted are interpolated. Why was this peculiar language introduced into the constitutions of North

and South Dakota, when nothing of the kind was found in that of the other seventeen states? Why did not the conventions which formed the organic law for North and South Dakota simply copy the language which, with this exception, is borrowed from the other constitutions, without inserting the excepting clause under consideration? To our mind, the answer to these questions is found in the peculiar and alarming condition of the people of Dakota territory in the year 1889, when the two Dakotas assumed the responsibilities of statehood. Such conditions had not before existed, and hence the constitutions of other states had made no provisions to meet such necessities. When the two states formed and adopted their constitutions the fact was well known and recognized by the people of Dakota that the condition of many farming communities was such that some comprehensive measure for their relief was an imperative necessity. In such a conjuncture the words were interpolated into § 185 of the constitution, which permit counties to loan their aid for the "necessary support of the poor." No constitutional grant of power was necessary to give the new governments authority to provide for the support of paupers in the poor-houses. That power is inherent, and exists in all governments as among their implied powers and duties. By universal consent, taxes are valid when laid for the support of paupers, or those likely to become paupers. There was no necessity and no reason for inserting a provision in the state constitutions of North and South Dakota authorizing counties to loan their aid to maintain the alms-houses. It would be absurd to assume that the framers of the constitutions and the people who adopted them intended by this provision to enable local municipalities to issue and sell bonds, and loan the proceeds to the inmates of the poorhouses; yet the power to loan aid in "support of the poor" is given. In our opinion, this power is conferred in the organic law expressly to meet the exigencies of the situation then existing, and that it is our duty to give it that effect. We believe, and so hold, that the class referred to in the exception contained in § 185 of the state constitution is the poor and destitute farmers of the state, and that the first legislature which met after the state was admitted, has, by the seed-grain statute, put a proper con-

struction upon the language in question. We therefore refuse to grant the writ applied for, and hold that the seed-grain statute is a valid enactment.

But our refusal to issue the writ can be placed upon still another ground. This case furnishes the first instance of an application to this court to put forth its original jurisdiction by issuing a writ except in a single *habeas corpus* case. We deem it expedient, therefore, to now indicate briefly the circumstances under which this court, in the exercise of a discretion vested in it will deem it its duty to take original cognizance of cases. § 87. of the constitution of the state authorizes this court to "issue writs of *habeas corpus, mandamus, quo warranto, certiorari,* and injunction." In the exercise of its appellate and supervisory powers over inferior courts the supreme court may have occasion from time to time to issue certain of the writs above enumerated, but such writs will not issue out of this court, in the exercise of its original jurisdiction, except in a limited class of cases, and such as are not ordinarily of frequent occurrence. All of the original and remedial writs which can be issued out of this court, under the constitution, may, under § 103 of the state constitution, be issued, not only by the district courts, but the judges thereof. We think the intention was to devolve upon the district courts, which are readily accessible, and at all times open for public business, the duty of assuming original cognizance of all ordinary cases which are remediable by means of the writs aforesaid; and to confer upon the supreme court, in the exercise of a discretion vested in it, the duty of taking original cognizance only in the limited class of cases where the writs, except the writ of *habeas corpus*, are sought for on motion of the attorney general as prerogative writs. Except in cases of *habeas corpus*, leave to file an information must be obtained by the attorney general. When the information makes out a *prima facie* case the writ will issue only in cases *publici juris* and those affecting the sovereignty of the state, its franchises and prerogatives, or the liberties of its people. In such cases the court will judge for itself whether the wrong complained of is one which demands the interposition of this court. The constitution of this state, with respect to the original jur-

isdiction of the supreme court, is substantially the same as that of the state of Wisconsin; and the interpretation given by the supreme court of that state to that part of its state constitution meets with the full approval of this court.   See Attorney Gen. v. Railroad Cos. 35 Wis. 425; Attorney Gen. v. City of Eau Claire, 37 Wis. 400; Wheeler v. Irrigation Co., 9 Colo. 248, 11 Pac. Rep. 103.   The case at bar affects only the local concerns of the county of Nelson and its tax-payers, and hence does not fall within the limited class of cases indicated above, and in which alone this court will assume original jurisdiction.   It follows that for this reason, also, the writ must be denied.   All concur.