# STATE EX REL. LEMKE, Attorney General, v. DISTRICT COURT OF STUTSMAN COUNTY et al.

## YAEGER et al. v. FRAZIER et al.

### (186 N. W. 381.)

**Courts — supreme court under its power of "superintending control" may control course of litigation so as to prevent injustice.**

1. Section 86 of the Constitution vests in the supreme court general superintending control over inferior courts. This power enables and requires it, in a proper case, to control the course of litigation in district courts so as to prevent injustice in cases where there is no appeal, or the remedy by appeal is inadequate.

**Courts — injunction — order restraining deposit of state funds in Bank of North Dakota held erroneous; supreme court authorized to vacate order of district court, restraining deposit of state funds as required by law; restraining order against officers vacated in exercise of power of superintending control.**

2. In the instant case, a restraining order was issued at the commencement of a taxpayers' suit, which order, among other things, enjoined the state treasurer from depositing state funds, and funds of state institutions in the bank of North Dakota. The laws of the state require the state treasurer to deposit such funds in the bank of North Dakota. For reasons stated in the opinion, it is *held:* That the order so issued is erroneous; that the case presented to this court is one within, and requires the exercise of, the constitutional power of superintending control over inferior courts; and that the facts and circumstances require that the restraining order be vacated and set aside.

**Injunction — should not ordinarily be issued on allegations on information and belief.**

3. Ordinarily, injunctions should not be issued on allegations made on information and belief, or, if so issued, should be dissolved.

Opinion filed December 30, 1921.

Courts, 15 C. J. § 446 p. 1026 n. 37; § 535 p. 1104 n. 79. Depositaries, 18 C. J. § 67 p. 591 n. 69. Injunctions, 32 C. J. § 383 p. 240 n. 48; § 386 p. 245 n. 6; § 423 p. 270 n. 32 New; § 536 p. 324 n. 83.

Application by the state, on relation of Wm. Lemke, Attorney General, for an appropriate writ to review and reverse an order issued by the District Court of Stutsman County, *J. A. Coffey,* Judge, in an action by Jacob Yaeger and others against Lynn J. Frazier and others,

Note.—See 14 R. C. L. 334.

which among other things restrained the state treasurer from depositing state funds and the funds of state institutions in the Bank of North Dakota.   Writ granted.

*Wm. Lemke,* Attorney General in pro. per.

*Ormsby McHarg* and *Oscar J. Seiler,* for respondents.

CHRISTIANSON, J.   On October 18, 1921, Jacob Yaeger and fifteen other taxpayers instituted an action in the district court of Stutsman county against a number of state officers, including the governor, the attorney general, the state treasurer, the secretary of state, and the state auditor.   The complaint is very lengthy, and charges, among other things, that the Bank of North Dakota has never been legally organized; that it is insolvent; that the state treasurer has deposited moneys which have come into his hands in the bank, and will continue to do so unless restrained from so doing.   The principal object of the action, as set forth in the prayer for judgment, is:

"That each and every one of the defendants above named be restrained and enjoined during the pendency of this action or until the further order of this court from depositing any funds belonging to the state of North Dakota, or of any political subdivision thereof, or belonging to any educational institution, and particularly any part of the state school fund in the so-called the Bank of North Dakota.

"That the Bank of North Dakota through its operators, managers and controllers, particularly the defendants Frazier, Lemke, Hagan and Cathro, be enjoined and restrained from accepting or receiving for the purpose of deposit any funds from any source, public or private, until the further order of this court.

"That D. C. Poindexter, as auditor of the state of North Dakota, . . . be restrained and enjoined from depositing any funds coming into his possession as the auditor of the state of North Dakota in the Bank of North Dakota until the further order of this court.

"That John Steen, as treasurer of the state of North Dakota, be restrained and enjoined, until the further order of this court, from mixing and confusing funds, arising from the lands and moneys received from the government of the United States or from other sources declared by the Constitution of the state to be trust funds, with other funds of the state; and particularly that he be restrained and enjoined

from depositing any of such funds upon which the said trust is imposed, or any other funds coming into his possession as state treasurer in the Bank of North Dakota until the further order of this court.

"That the Bank of North Dakota be enjoined and restrained during the pendency of this action and by the final judgment to be rendered herein, from representing itself as a bank and a proper depositary of funds as a bank or from representing itself as a corporation.

"That the Bank of North Dakota be adjudged to be insolvent, and thereby unfit to be the depositary of any public funds by reason of its insolvency and inability to pay back funds and moneys deposited with it by banks, public officials having control of the safe-keeping of state funds, and the funds of state penal, educational, and industrial institutions."

Upon this complaint, and upon affidavits of one of the plaintiffs and one of their attorneys, Honorable J. A. Coffey, one of the judges of the fourth judicial district, issued an order returnable before said district court at Jamestown, in Stutsman county at 10 o'clock A. M., November 3, 1921, citing the defendants to show cause at that time and place why they should not be restrained during the pendency of the action from in any manner doing any of the things against the doing of which a permanent injunction is asked for in the action. And in such order it was further provided that—

During the pendency of the action, the "defendants, and each and all of them, individually and officially, be, and they are hereby, restrained and enjoined in the following respects:

"(1) That each and every one of the defendants above named be, and is hereby, restrained and enjoined during the pendency of this action or until the further order of this court from depositing any funds belonging to the state of North Dakota, or of any political subdivision thereof, or belonging to any educational institution, and particularly any part of the state school fund in the so-called Bank of North Dakota.

"(2) That the Bank of North Dakota, through its operators, managers, and controllers, particularly the defendants Frazier, Lemke, Hagan, and Cathro, be, and is hereby, enjoined and restrained, during the pendency of this action or until the further order of this court,

from accepting or receiving for the purpose of deposit any funds from any source, public or private.

"(3) That Lynn J. Frazier as governor, Thomas Hall as secretary of state, John Steen as treasurer, and D. C. Poindexter as auditor of the state of North Dakota be, and they are hereby, restrained and enjoined, during the pendency of this action and until the further order of this court, from preparing for issue, signing, sealing, and indorsing any bond or bonds upon property of state owned utilities, enterprises, or industries.

"(4) That D. C. Poindexter as auditor of the state of North Dakota be, and he is hereby restrained and enjoined, during the pendency of this action or until the further order of this court, from auditing any accounts or paying the same, or recommending the same for payment, other than for the legitimate operating expenses of the state of North Dakota, and that he be, and is hereby, restrained and enjoined during the pendency of this action, or until the further order of this court, from depositing any funds coming into his possession as the auditor of the state of North Dakota in the Bank of North Dakota.

"(5) That John Steen as treasurer of the state of North Dakota be, and is hereby, restrained, during the pendency of this action or until the further order of this court, from mixing and confusing funds arising from the lands and moneys received from the government of the United States, or from any other sources declared by the Constitution of the state to be trust funds, with other funds of the state, and particularly from depositing any of such funds upon which the said trust is imposed, or any other funds coming into his possession as State Treasurer in the Bank of North Dakota. . . .

"(10) That each and every one of the defendants above named, their servants, deputies, attorneys, agents, and employees, and each of them, be, and they are hereby, restrained and enjoined, during the pendency of this action or until the further order of this court from in any manner performing any of the acts complained of in this complaint, which have been described as resulting in irreparable injuries to the plaintiffs and all other taxpayers in the state if permitted to be performed. . . .

"(12) That the Bank of North Dakota be and it is hereby enjoined and restrained, during the pendency of this action or until the further

order of this court, from representing itself as a bank and a proper depositary of funds as a bank, or from representing itself as a corporation.

"(13) That the Bank of North Dakota be, and it is hereby, adjudged to be insolvent, and thereby unfit to be the depositary of any public funds by reason of its insolvency and inability to pay back funds and moneys deposited with it by banks, public officials having control of the safe-keeping of state funds, and the funds of state penal, educational, and industrial institutions, pending this action or until the further order of the court."

On the 20th day of October, 1921, the attorney general made an application to this court for relief against the order issued by Judge Coffey and asked that this court issue an appropriate writ in the matter. The attorney general's application was supported among others, by the affdavits of himself, the state treasurer, and the Manager of the Bank of North Dakota. In his affidavit the state treasurer says that

"He has been advised by the attorney general of the state of North Dakota that the only legal depositary for the funds of the state is the Bank of North Dakota, and that, as state treasurer, he has deposited all funds up to the present time coming into his possession as state treasurer in the Bank of North Dakota. That the funds coming into the office of the state treasurer amount to from $25,000 to $50,000 a day. That a copy of the restraining order of the court in the above-entitled action has been served upon him, restraining him from depositing any more funds in the Bank of North Dakota; and that unless such order is annulled and vacated, or some other depositary designated, it will greatly hamper the work of his department, and, that he has no place where to deposit such funds when they come in; and that in many cases checks coming to his department should be promptly cashed, otherwise loss may be sustained upon them."

Also that

"Owing to the fact that he does not know where to deposit said funds, the work in his department is greatly hampered and delayed and will accumulate very rapidly, unless some relief is given."

In his affidavit the attorney general stated that he had requested both judges of the Fourth judicial district to vacate the restraining order, and had been unsuccessful in obtaining a vacation thereof.

This court thereupon issued its writ, directing the said district court and said Honorable J. A. Coffey, as judge thereof, to certify all papers in said cause, and a transcript of the record and all proceedings had therein, to this court, and directed that no further proceedings be had, and that the restraining order be vacated until the further order of this court.

On the return day the attorneys of record for the plaintiffs in the court below appeared in behalf of the respondents, district court and the judge thereof. The attorney general appeared for all the state officers named as defendants, with the exception of the secretary of state, superintendent of public instruction, and the state treasurer. These officers appeared by other counsel, and filed a motion that the writ be quashed. The motion is based upon two grounds: (1) That the complaint states a cause of action; and (2) that the district court has exclusive jurisdiction of such cause of action. On the oral argument, the state treasurer was represented by counsel other than the one who subscribed the motion to quash, and such counsel stated that the state treasurer had one and only one interest in the litigation, and that was to be permitted to discharge the duties of his office in a regular and lawful manner. The motions to quash presented by the state officers were apparently prepared under a misconception of the scope and purpose of the writ issued. The sole purpose of the writ was to review the action of the trial court in issuing the restraining order. We do not find it necessary to refer to the matters set forth in the return filed by the district judge, for in our view of the case it is controlled by certain legal principles applicable to undisputed facts, or facts of which we must take judicial notice. In other words, we deem the questions arising in this case to be merely questions of law.

The questions so presented for determination are:

(1) Was the action of the district court in granting the order which it issued erroneous?

(2) If so, can this court afford relief in this proceeding?

(3) Are the circumstances in this case such as will justify this court in granting the relief asked?

Logically the question as to the jurisdiction and the remedy should be considered first; but, inasmuch as this in turn depends upon, and necessitates a statement and consideration of, the facts and circum-

stances relating to the order made by the district court, we will consider the questions in the order stated.

1. In 1919 the legislature of this state enacted a law (chapter 147, Laws 1919) establishing a bank under the name of the Bank of North Dakota to be operated by the state. The industrial commission, consisting of the governor, attorney general, and the commissioner of agriculture and labor, were, by the terms of the act, placed in control of the operation and management of the bank, and were given the right of eminent domain to acquire the necessary property. The bank was authorized to make loans to individuals, associations, and corporations when secured by first mortgages on lands, in the state. And in general the act prescribed the functions, and provided for the operation, of the bank. An appropriation of $100,000 was made immediately available to carry out the provisions of the act. Section 7 of the act provided:

"All state, county, township, municipal and school district funds, and funds of all penal, educational and industrial institutions and all other public funds shall be, by the person having control of such funds, deposited in the Bank of North Dakota within three months from the passage and approval of this act, subject to disbursement for public purposes on checks drawn by the proper officials in the manner now or hereafter to be provided by law; provided, however, that on a proper showing made by any official having control of public funds, the industrial commission may permit a postponement of the deposit of such funds or any part thereof in the Bank of North Dakota, the period of such postponement not to exceed six months. And provided, further, that if any such funds are now loaned by authority of law under a contract terminating at a future time, then the deposit of such funds in the Bank of North Dakota shall not be required until two months after time of expiration of such contract. Any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished by imprisonment in a county jail for not less than ninety days, and by a fine of not less than one hundred dollars." Laws 1919, § 7, chap. 147.

The act was approved February 25, 1919, and by its terms became effective on and after its passage and approval. Referendum petitions, however, were filed, and the act was submitted to the people of the

state at a referendum election held June 26, 1919, with the result that it was approved by a majority of the votes cast thereon at such election. See Laws 1919, p. 509. Subsequently the foregoing provision was amended, by a law proposed by initiative petition and adopted by the people at an election held March 16, 1920, to read as follows:

"Sec. 7. All state funds, and funds of all state penal, educational and industrial institutions shall be, by the persons having control of such funds, deposited in the Bank of North Dakota." Laws 1921, p. 255.

It will be noted that the original act provided, not only that state funds and the funds of state institutions should be deposited in the Bank of North Dakota, but also that the funds of all counties, townships, school districts and municipalities should be deposited therein. The amendatory act changed the law so that the funds of counties, townships, school districts, and municipalities were excluded from the operation of the act; but it retained and re-enacted the provision requiring that all state funds and the funds of all state institutions be deposited in the Bank of North Dakota. The Bank of North Dakota opened for business shortly after the act creating it had been approved at the referendum election held June 26, 1919, and all state funds were shortly thereafter deposited in the bank by the state treasurer, and have been kept on deposit in that bank at all times since. The constitutionality of the act establishing the Bank of North Dakota was sustained by the decision of this court rendered January 2, 1920, and by the decision of the Federal Supreme Court rendered June 1, 1920. See Green v. Frazier, 44 N. D. 395, 176 N. W. 11; Id. 253 U. S. 233, 64 L. ed. 878, 40 Sup. Ct. Rep. 499. The status of the bank was given elaborate consideration by this court in Sargent County v. State, doing business as Bank of North Dakota, 47 N. D. 561, 182 N. W. 270. That was an action by Sargent county against the Bank of North Dakota for moneys deposited therein under § 7 of the original bank act, and garnishment proceedings ancillary to the main action were brought against a number of national and state banks wherein the Bank of North Dakota had deposited funds, and the right of the county to maintain such garnishment suit was upheld. It is apparent, therefore, that the Bank of North Dakota, its establishment, functions, and status, has received the consideration not only of the courts, but

has received the consideration of the people of the state as well. Since the Bank of North Dakota came into existence and the state funds were deposited therein, it has been the duty of the state treasurer to deposit all state and state institutional funds which have come into his possession in that bank. And no provision is made under existing laws whereby he may, under any circumstances, deposit such moneys in any other banking institutions.

Under the laws of this state "an injunction cannot be granted . . . to prevent the execution of a public statute by officers of the law for the public benefit" (subdivision 4, § 7214, Comp. Laws, 1913), or "to prevent the exercise of a public or private office in a lawful manner by the person in possession." Subdivision 6, § 7214, Comp. Laws, 1913. By the order issued by the district court in this case, the state treasurer was expressly enjoined from depositing state funds and funds of state institutions in the institution in which the law of the state as enacted by the legislature and approved by the people commanded him to deposit such funds. In other words, the order enjoined the state treasurer from performing the duty which the law enjoined upon him with respect to such funds. It is not a case where officers are sought to be enjoined from putting an unconstitutional statute into effect. For acts similar to those which were enjoined by the restraining order issued in this case had been committed continuously by the state treasurer, and his predecessor in office, for more than two years before this action was commenced; and whatever defects, if any, existed in the organization of the Bank of North Dakota, had existed during that period of time. It is a matter of common knowledge that in the recent past many financial institutions have failed. The remittances to the state treasurer, according to his affidavit, aggregated from $25,000 to $50,000 per day, and consisted principally of checks and drafts drawn upon various banks throughout the country. By the order issued in this case, the state treasurer was prevented from depositing these in the Bank of North Dakota. And, as already indicated, the law specifically enjoined upon him as a duty to deposit these items in that institution, and necessarily negatived the right or duty to deposit them elsewhere. It is, we think, self-evident that the order thus issued could not do otherwise than hamper and impede the state treasurer, as well as other state officers and boards in the dis-

charge of their duties. And, if the order was permitted to remain in force and effect, it seems highly probable that numerous legal complications would arise and a multiplicity of suits might result therefrom.

Many of the averments in the affidavits upon which the order was issued, as well as the allegations in the complaint, purport to be based upon statements claimed to have been made by the state treasurer. The state treasurer, in an affidavit submitted by the attorney general in support of the application to this court, denied that he made some of the statements attributed to him. Ordinarily, at least, injunctions should not be issued upon allegations made on information and belief, or, if issued, should be dissolved. High, Inj. 4th ed. § 1525; State ex rel. Register v. Patterson, 13 N. D. 70, 72, 99 N. W. 67. A careful consideration of all the facts and circumstances leads us to the conclusion that the trial court was not justified in issuing the restraining order which it did, and that that order is clearly wrong.

2. Has this court power to grant relief in this proceeding against the order made by the district court? We think it has. On the oral argument it was asserted by the plaintiffs that a writ of certiorari lies only in case the district court has exceeded its jurisdiction, and there is no appeal, nor in the judgment of the court any other plain, speedy, and adequate remedy. Comp. Laws 1913, § 8445. And that a writ of prohibition can be issued against the district court to arrest proceedings therein only when such proceedings are without or in excess of the jurisdiction of the district court. Comp. Laws 1913, § 8470. It was further asserted that, inasmuch as the district court is a court of general jurisdiction, it had and has jurisdiction of the cause or causes of action set forth in the complaint; also, that under the statute the defendants might have moved the district court to vacate the order, and that if such motion was denied the order entered would be appealable. Assuming, without deciding, that these contentions are correct, it by no means follows that this court is without power to grant relief in this proceeding against the restraining order issued by the district court. The Constitution provides:

"Sec. 86. The supreme court, except as otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be coextensive with the state and shall have a general superintending con-

trol over all inferior courts under such regulations and limitations as may be prescribed by law.

"Sec. 87. It shall have power to issue writs of habeas corpus mandamus, quo warranto, certiorari, injunction and such other original and remedial writs as may be necessary to the proper exercise of its jurisdiction, and shall have authority to hear and determine the same; provided, however, that no jury trial shall be allowed in said supreme court, but in proper cases questions of fact may be sent by said court to a district court for trial."

It became necessary for this court in the early history of the state to construe these sections. In State v. Nelson County, 1 N. D. 88, 8 L.R.A. 283, 26 Am. St. Rep. 609, 45 N. W. 33 (decided April 21, 1890), the original jurisdiction of this court was invoked. In the opinion in that case this court said:

"This case furnishes the first instance of an application to this court to put forth its original jurisdiction by issuing a writ except in a single habeas corpus case. We deem it expedient, therefore, to now indicate briefly the circumstances under which this court, in the exercise of a discretion vested in it will deem it its duty to take original cognizance of cases. Section 87 of the Constitution of the state authorizes this court to 'issue writs of habeas corpus, mandamus, quo warranto, certiorari, and injunction.' In the exercise of its appellate and supervisory powers over inferior courts the supreme court may have occasion from time to time to issue certain of the writs above enumerated, but such writs will not issue out of this court, in the exercise of its original jurisdiction, except in a limited class of cases, and such as are not ordinarily of frequent occurrence." 1 N. D. 101.

Here, then, we have a recognition by this court of the fact that these constitutional provisions vest in this court: (1) Appellate jurisdiction; (2) supervisory or superintending jurisdiction; and (3) original jurisdiction.

Shortly thereafter, namely in 1891, the legislative assembly of this state enacted a statute adopting the views announced in State v. Nelson County. The statute provided:

"The supreme court has power in the exercise of its original jurisdiction to issue writs of habeas corpus, mandamus, quo warranto, certiorari and injunction; and in the exercise of its appellate jurisdiction

and in its superintending control over inferior courts it may issue such original and remedial writs as are necessary to the proper exercise of such jurisdiction." Chapter 118, Laws 1891; § 7339, Comp. Laws 1913.

This statute has never been repealed or amended, and the correctness of the rule named in the Nelson County Case and in the statute has never been questioned, but has been reaffirmed. In State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234, this court again had occasion to construe these constitutional provisions. In the opinion prepared by Mr. Justice Corliss in that case the court said:

"These provisions, as we construe them, vest in this court—first, appellate jurisdiction; second, general superintending control over inferior courts; third, power to issue the writs specified, not only in furtherance of other jurisdiction, but also in the exercise of original jurisdiction; fourth, authority to issue such other original and remedial writs as may be necessary to the proper exercise of the jurisdiction vested in this court. This last grant was unnecessary, as we shall see, and was doubtless inserted for greater certainty. These ancillary writs are to be employed in furtherance of any jurisdiction possessed by this court, whether appellate, original, or superintending." 5 N. D. p. 361.

In State v. Nelson County, supra, this court called attention to the fact that provisions relating to the powers of the supreme court, substantially similar to our own, were contained in the Wisconsin Constitution; that those provisions had been construed by the supreme court of Wisconsin in certain cases therein cited, and the holding of the Wisconsin court in those cases was approved by this court. 1 N. D. 101, 102. The Wisconsin cases so cited and approved were decided more than a quarter of a century before the North Dakota Constitution was framed. In Atty. Gen. v. Blossom, 1 Wis. 317, the Wisconsin supreme court held that the constitutional provisions of that state contained three separate grants of jurisdiction to the Supreme court, i. e.: (1) Appellate jurisdiction; (2) the superintending control over inferior courts; and (3) the original jurisdiction to be exercised by means of certain perogative writs for the purpose of protecting the sovereignty of the state, preserving the liberty of the people, and se-

curing the rights of its citizens. The language in the Wisconsin Constitution relative to the matter here under consideration is:

"The supreme court shall have a general superintending control over all inferior courts."

In discussing this clause the Wisconsin supreme court, in Atty. Gen. v. Blossom, supra, said:

"This sentence, contains a clear grant of power. We will not undertake to say, that without this grant the power would not be in the court. It is not necessary to discuss that question. We are endeavoring to arrive at the proper construction of the written law. It is a grant of power. It is unlimited in extent. It is undefined in character. It is unsupplied with means and instrumentalities. The Constitution leaves us wholly in the dark as to the means of exercising this clear, unequivocal grant of power. It gives, indeed, the jurisdiction, but does not pretend to intimate its instruments or agencies."

Again, in discussing the third clause of the section (relating to the original jurisdiction) it was said:

"Here is also a distinct grant of power. The first of the section is restrictive, one of limitation merely. The two last are clear grants of the power, the one of which gives the power of a superintending control over inferior courts; the other giving the power to issue certain writs in appropriate cases, and to hear and determine the same."

These constitutional provisions were again considered by the court in a masterly opinion prepared by Chief Justice Ryan, in Atty. Gen. v. Chicago & N. W. R. Co. 35 Wis. 425. The opinion in that case was referred to and specifically approved by this court, both in State v. Nelson County and State v. Archibald, supra. In that opinion the conclusions reached in the Blossom Case, to the effect that there were three separate and independent grants of jurisdiction in the section quoted, were fully approved, and the court said (pages 515 et seq.):

"The framers of the Constitution appear to have well understood that, with appellate jurisdiction, the court took all common-law writs applicable to it; and with superintending control, all common-law writs applicable to that; and that, failing adequate common-law writs, the court might well devise new ones, as Lord Coke tells us as 'a secret in law.' Hence the Constitution names no writ for the exercise of the appellate or superintending jurisdiction of the court."

And again:

"The grant of original jurisdiction is one entire thing, given in one general policy, for one general purpose, though it may have many objects and many modes of execution. So it is of the appellate power. So it is of the superintending control. There are three independent and distinct grants of jurisdiction, each compact and congruous in itself; each a uniform grant of analogous remedies, though to be exercised in several ways, by several writs, in legal and equitable proceedings, on many objects, in great variety of detail. The Constitution wisely, almost necessarily, stopped with the general grants of jurisdiction, carefully distinguished, and left details to practice and experience. . . . The three grants of jurisdiction proceed on one policy; appellate jurisdiction to decide finally all ordinary litigation; superintending jurisdiction over all other courts to control the course of ordinary litigation in them; and, outside of these, original jurisdiction of certain proceedings at law and in equity, to protect the general interests and welfare of the state and its people, which it would not do (to quote Smith, J. . . .) to dissipate and scatter among many inferior courts."

The principles thus announced in Atty. Gen. v. Blossom, and Atty. Gen. v. Chicago & N. W. R. Co. were reaffirmed by the Wisconsin Supreme Court in State ex rel. Fourth Nat. Bank v. Johnson, 103 Wis. 591, 51 L.R.A. 33, 79 N. W. 1081. The opinion in the latter case was written by Judge Winslow. After referring to the decisions in Atty. Gen. v. Blossom, and Atty. Gen. v. Chicago & N. W. R. Co. and quoting with approval the language heretofore quoted from these opinions, the court said:

"It must be regarded as settled, therefore, that by the constitutional grant of 'a general superintending control over all inferior courts' this court was endowed with a separate and independent jurisdiction, which enables and requires it in a proper case to control the course of ordinary litigation in such inferior courts, and was also endowed with all the common-law writs applicable to that jurisdiction. What those writs are, and the manner of their use, are questions which have not as yet been directly presented or decided, but they are necessarily involved in the present case, and hence must now be considered. That the makers of the Constitution used the words in question understandingly,

and with a specific meaning, and not as a mere rhetorical flourish or high sounding form of words, can admit of no doubt. Only a superficial knowledge of the growth and development of the English judicial system is necessary to determine what that meaning was and is. The English Court of King's Bench had a superintending jurisdiction over all the inferior courts of the realm, which it freely exercised by the use of well-defined writs from very early times. The Norman idea was that the king was the fountain of all justice, and hence, when an inferior court exceeded its jurisdiction, or refused to act within its jurisdiction to the prejudice of a suitor, and no other remedy was provided, application could be made by the aggrieved party to the king's court to restrain or compel action. The King's Bench was peculiarly the king's court, in which he sometimes sat himself, and was always supposed to sit when not personally present. It succeeded in this respect the very ancient aula regis when (near the close of the Norman period) that court was divided into the Courts of the King's Bench, Common Pleas, and Exchequer. Being the king's court, it was natural, if not inevitable, that the king's sovereign power of causing justice to be done to his subjects in the course of litigation in inferior courts should be administered by and through that court. Blackstone says of this court (3 Com. chap. 4, p. 42): 'The jurisdiction of this court is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove the proceedings to be determined here, or prohibit their progress below. It superintends all civil corporations in the kingdom. It commands magistrates and others to do what their duty requires, in every case where there is no other specific remedy. It protects the liberty of the subject by speedy and summary interposition. It takes cognizance both of criminal and civil cases; the former in what is called the crown side or crown office, the latter in the plea side of the court.'

"It is very apparent that when the makers of the constitution used the words 'superintending control over all inferior courts' they definitely referred to that well- known superintending jurisdiction of the Court of King's Bench. In England it was a branch of the king's power lodged with the king's court; in this country it is a branch of the sovereign power of the people, committed by them as a sacred charge to this court, not to be exercised upon light occasion, or when other and

ordinary remedies are sufficient, but to be wisely used for the benefit of any citizen when an inferior court either refuses to act within its jurisdiction, or acts beyond its jurisdiction to the serious prejudice of the citizen.   2 Spelling, Extr. Relief, § 1388."

103 Wis. 613, 614.

The Constitution of the state of Montana contains a provision identical with § 86 of the North Dakota Constitution.   See Montana Constitution, § 2, art. 8.   The provision of the Montana Constitution was construed in State ex rel. Whiteside v. Dist. Ct. 24 Mont. 562, 63 Pac. 400.   In its opinion in that case, the court said:

"As the appellate jurisdiction was granted for the purpose of revision and correction, and the original jurisdiction under these writs was granted to enable us to render such relief as is appropriate under them, so the supervisory power was granted to meet emergencies to which those other powers and instrumentalities are not commensurate.   It is independent of both, and was designed to infringe upon the functions of neither.   It has its own appropriate functions, and, without undertaking to define particularly what these functions are, we think one of them is to enable this court to control the course of litigation in the inferior courts where those courts are proceeding within their jurisdiction, but by mistake of law, or willful disregard of it, are doing a gross injustice, and there is no appeal, or the remedy by appeal is inadequate."   24 Mont. 562.

This doctrine has subsequently been reaffirmed by the Montana court in many cases.   See State ex rel. Anaconda Copper Min. Co. v. District Ct. 25 Mont. 504, 65 Pac. 1020; State ex rel. Sutton v. District Ct. 27 Mont. 128, 69 Pac. 988; State ex rel. Shores v. District Ct. 27 Mont. 349, 71 Pac. 159; State ex rel. Parrot Silver & Copper Co. v. District Ct. 28 Mont. 528, 73 Pac. 230; Re Weston, 28 Mont. 207, 72 Pac. 512.

The Constitution of our sister state, South Dakota, also contains a provision, the language of which is identical with section 86 of the North Dakota Constitution.   See Constitution S. D. article 5, § 2. The supreme court of South Dakota has held that—

"This provision vests the supreme court of that state with authority, to be exercised within its judicial discretion, to review by means of appropriate writs "the proceedings of subordinate courts in cases where

the action complained of is beyond the discretionary powers of such courts, or when there is an abuse of such discretion, and the remedy by appeal is inadequate and the case is urgent, and the circumstances require prompt action on the part of this court, to prevent injustice and injury resulting." Huron v. Campbell, 3 S. D. 309–317, 53 N. W. 185; Vine v. Jones, 13 S. D. 54, 82 N. W. 82.

The records of this court bear ample evidence that this court has not only recognized and declared the existence of the power of superintending control over inferior courts, but that it has had no hesitancy to exercise the power in proper cases. Thus the power has frequently been repeatedly exercised to review orders relating to a change of venue in criminal cases. See Murphy v. District Ct. 14 N. D. 542, 105 N. W. 728, 9 Ann. Cas. 170; Zinn v. District Ct. 17 N. D. 135, 114 N. W. 472; State v. Winchester, 18 N. D. 534, 122 N. W. 1111, 21 Ann. Cas. 1196; Lowe v. District Ct. 48 N. D. 1, 181 N. W. 92. See also State ex rel. Enderlin v. Rose, 4 N. D. 319, 26 L.R.A. 593, 58 N. W. 514; State ex rel. Dorgan v. Fisk, 15 N. D. 219, 107 N. W. 191; Selzer v. Bagley, 19 N. D. 697, 124 N. W. 426; State ex rel. Red River Brick Corp. v. District Ct. 24 N. D. 28, 138 N. W. 988.

In State ex rel. Enderlin v. Rose, supra, the sheriff had attached property in the hands of an assignee for the benefit of creditors. The district court upon affidavit of the assignee made an ex parte order, directing the sheriff to return the property to the assignee. On an original application for a writ of certiorari this court held the order made by the district court to be void, and hence directed that it be set aside. The court further held that the case was not before the court on appeal; that the writ had been issued by the supreme court, not in the exercise of its appellate jurisdiction, but under the power of superintending control over inferior courts vested in it by section 86 of the Constitution. In considering the function of the superintending power, in State ex rel. Red River Brick Corp. v. District Ct. supra, this court said:

"When a proper case arises for the exercise of this power, the writ necessary to fit the case may take the nature of a command or of a prohibition, or, to enable the court to determine its character, it may be found necessary to issue a preliminary writ requiring records to be certified up, and this may be done. We are satisfied that the author-

ities to which reference has been made are applicable here, and that their determination of the purpose of the Constitution framers in granting this superintending control is correct. It has been so intimated in several of the cases decided by this court, to which reference has been made. Whether or not the remedy by appeal is adequate or speedy, must be determined by the exercise of the sound discretion of this court, applied to the facts in each given case. . . . We are satisfied that the power of superintending control is very broad, but in line with the authorities cited, and many more which have been examined, we feel constrained to hold that this power should not be exercised except in case of emergency or exigency, or when made necessary by the lack of other adequate remedy, or when the ends of justice imperatively demand it." 24 N. D. 32, 33.

In State ex rel. Fourth Nat. Bank v. Johnson, 103 Wis. 591, 51 L.R.A. 33, 79 N. W. 1081, relief was granted against a certain order relating to the account of an assignee. The order of the trial court was appealable, but it was held that the remedy by appeal was not adequate.

State ex rel. Anaconda Copper Min. Co. v. District Ct. 25 Mont. 504, 65 Pac. 1020, involved, and relief was afforded against, an order made by the district court, relating to certain mining property, whereby one of the parties to the litigation was granted permission to enter and inspect certain surrounding mines for the purpose of obtaining evidence in connection with the pending litigation.

The decisions of our own state, as well as the decisions of Wisconsin, Montana, and South Dakota, fully sustain the conclusion that this court, by virtue of its power of superintending control over inferior courts, has authority to grant relief against the restraining order erroneously issued in this case.

3. Do the facts in the case require this court to grant the relief asked? We think they do. The restraining order was not appealable. Comp. Laws 1913, § 7841, subd. 5. It is true, if the defendants had moved in the district court, upon notice, that the restraining order be set aside, an appeal would have lain from the order refusing to vacate the restraining order. In the circumstances of the case, however, we do not believe that this relief would have been adequate. In other words, we are of the opinion that the facts and circumstances in the

case are such as to justify the exercise of the supervisory jurisdiction, and to require this court to issue a writ directing the district court, and the judge thereof, to set aside the restraining order issued at the commencement of the action.

We express no opinion as to the merits of the cause, or causes, of action, purported to be set forth in the complaint. What we have said in the opinion is directed solely to the restraining order issued at the commencement of the action.

BIRDZELL and BRONSON, JJ., concur.

GRACE, Ch. J. (concurring specially). Under section 86 of the Constitution, this court has a general superintending control over all inferior courts. The facts and circumstances of this case are of the character to warrant the exercise of the supervisory power of this court and, in the exercise of that power, it is proper to issue a writ, requiring and directing the district court and the judge thereof to set aside the restraining order issued at the commencement of the action.

There is no necessity here to consider the merits of the alleged cause or causes of action.

ROBINSON, J. (dissenting). The plaintiffs bring this action in Stutsman county against the governor and nearly all the state officers and the Bank of North Dakota. The complaint is multifarious in the extreme. It covers seventeen pages of single-space typewriting. In a general way it charges all the defendants with official misconduct, and demands that each and all of the state officers be enjoined and restrained from doing any more wrongs. The demand covers two full pages. Pending the action all the defendants were enjoined from depositing any funds belonging to the state or any political subdivision of the same in the Bank of North Dakota. (2) Frazier, Lemke, Hagan, and Cathro from accepting for the purpose of depositing any funds from any source, public or private. (3) Frazier, Hall, John Steen and Poindexter from preparing, issuing, scaling, or assigning any bonds upon property of the state or state-owned utilities. (4) Poindexter from auditing any accounts or paying the same or recommending the same for payment and from depositing any money in the Bank

of North Dakota. (5) Steen from mixing and confusing funds. (6) Frazier, Lemke, Poindexter, Hagan, and Steen from fixing any state levy to pay interest on bonds of the state-owned utilities. (7) Spitzer-Rorick & Company from selling any bonds of the state. (8) Wallace, tax commissioner, from issuing any orders in respect to the state tax levy, so far as it relates to bonds issued upon property of the state. (9) Frazier, Lemke, Hagan, and Cathro from disbursing any funds in the State Bank other than checks to bona fide depositors.

Well, that is a fair sample. The effect of the injunctional order was to put a brake on all the official business of the state officers. This suit presents matters of strictly public concern, involving questions affecting the rights of the state. It presents an emergency, and so on application to this court an order was promptly issued, revoking the temporary injunction and directing the trial judge to certify the case to this court. The name of the order is of no consequence. You may call it certiorari or what you will. It was issued under the supervisory jurisdiction and the original jurisdiction of this court. Laws 1891, chap. 118. State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234. Now the matter is properly before this court for a final determination. The case presents only two questions: (1) Was the action properly brought in Stutsman county; did the court have jurisdiction? (2) Does the complaint state facts sufficient to invoke equity jurisdiction?

The bank defendant is an agency of the state, and is subject to the absolute control of three state officers. The state owns the bank and all its property and effect. The bank is organized under a special act, which provides how it may be sued. Laws 1919, chap. 147. Actions against the bank shall be brought in the county where the bank has its principal place of business, except as otherwise provided by the Code. Sections 7415, 7416, 7418. As those sections do not relate to such an action as this, the exceptions do not apply to it. The plaintiffs sue as taxpayers to control the official action of state officers. They aver no special injury to themselves. If they may bring such an action in Stutsman county, then of course in any other county a few taxpayers may bring a similar action, and thus force the state officers to neglect their official business and pass their time in running around the state for the removal or defense of such actions. Hence, for those reasons,

and by force of the statute, we must conclude that a taxpayers' suit, such as this, to control the official action of the bank and the state officers, must be brought in Burleigh county and not in any other county.

2. The second point is on the sufficiency of the complaint. It is clearly multifarious. It includes as defendants several parties who have no common interest in the action. It improperly unites several causes of action. It is bad for want of equity. While the plaintiff may unite in the same complaint several causes of action for injuries, with or without force, to person or property, or either, the causes of action so united must all belong to the same class, and must affect all the parties to the action. Code, § 7466. As the complaint and the injunctional order show, against each defendant there is a different, though not a separate, complaint or cause of action. There is a different injunctional order. No court should enter upon the trial of such a conglomeration of heterogenous causes of action. If the plaintiffs, as taxpayers, have a meritorious cause of action against either the bank or any of the defendants to restrain them from official misconduct, their proper course is to commence the action in Burleigh county on a complaint stating concisely a cause of action affecting all the defendants and appealing to equity jurisdiction.

For reasons stated the action is dismissed.